**In the Matter of THE CENTRAL RAIL-
ROAD COMPANY OF NEW
JERSEY, Debtor.
No. B. 401-67.**

United States District Court
D. New Jersey.
Sept. 21, 1967.
As Amended Sept. 26, 1967.

Martin Tuman, AUSA, and Paul A. Sweeney, Dept. of Justice, Washington, D. C., for the Government.

Charles J. Milton, Milton, Keane & De-Bona, and Harold A. Seide, Jr., Jersey City, N. J., for trustees.

Lamb, Blake, Hutchinson & Dunne, by Raymond Lamb, Jersey City, N. J., for The Reading Co.

Richard B. Wachenfeld, Newark, N. J., for Central R.R. Co. of N. J.

Steven J. Stein, New York City, for Manufacturers Hanover Trust Co.

Morris M. Ravin, by David Ravin, and David A. Biederman, Newark, N. J., for State of New Jersey.

Lum, Biunno & Tompkins, by William F. Tompkins, Newark, N. J., for Pennsylvania R.R. Co.

Charles I. Malovany, Caldwell, N. J., by Edwin Gross, Verona, N. J., for Tri-County Asphalt Corp.

Riker, Danzig, Sherer & Brown, by Charles Danzig, Newark, N. J., for Lehigh Coal and Navigation Co.

Jerome H. Shapiro, Kenneth H. Lundmark, New York City, and O'Mara, Schumann, Davis & Hession, by Gerald O'Mara, Jersey City, N. J., for New York Cent. R.R. Co.

## MEMORANDUM and ORDER

AUGELLI, District Judge:

This matter came on for hearing before the Court on the continued return day of an order issued on the verified petition of the trustees of the Debtor herein, directing The New York Central Railroad Company (NYC), to show cause

why it should not be held in contempt for violating an order of this Court, and for other relief.

The operative facts are not in dispute. By order (No. 1), dated March 22, 1967, this Court approved the petition for reorganization filed by the Debtor under section 77 of the Bankruptcy Act (11 U.S.C.A. § 205). Perry M. Shoemaker and John E. Farrell were appointed trustees, and duly qualified as such. Their petition for relief was filed on June 7, 1967, and a hearing thereon took place on June 26, 1967.

The record discloses that the Debtor, in the regular course of its business as a railroad carrier engaged in interstate commerce, interchanges freight shipments with other railroads, including NYC. These operations, involving interchanges of freight movements over the lines of several railroad companies, give rise to so-called interline freight balances which are settled among the participating carriers in accordance with rules promulgated by the American Association of Railroads (AAR).

In the ordinary conduct of railroad business, most freight shipments are made on a "collect" basis. The "terminal" or "settling" carrier collects the total freight charges from the consignee. Thereafter, by means of debit or credit entries, or the exchange of drafts, as the case may be, settlement is made with all railroads connected with the particular movement. For example, a carload of freight originating in California, and terminating at the facilities of the Debtor in Jersey City, would result in the collection by the Debtor of the freight charges from the consignee. As the "terminal" or "settling" carrier, the money so collected by the Debtor would then be allocated, proportionately, among the railroads which participated in the freight movement from West to East.

The proof in this case is uncontradicted that this method of settling interline freight balances is followed by all railroads. And the proof is likewise uncontradicted that the money collected by any "terminal" or "settling" carrier in connection with the movement of freight in which other railroads have participated, is treated by such "terminal" or "settling" carrier as funds of its own. There is no segregation of the money to reflect what portion thereof may ultimately be payable to a participating railroad, nor are the funds earmarked in any way. The money so collected by the "terminal" or "settling" carrier is deposited in such carrier's general bank account and used for general corporate purposes. NYC makes a point of the fact that funds representing interline freight balances are not carried on the books or records of the "terminal" or "settling" carrier as "operating income". The reason for this is obvious, but in any event, such fact can have no legal significance in the resolution of the issues here involved.

The treatment accorded interline freight balances by NYC does not, as already indicated, differ from the practice followed by all other railroads. NYC deposits the money so collected in its general bank account, commingles it with other corporate funds, and uses the same in its day to day business operations. The money is not earmarked, nor is it segregated for the benefit of any particular railroad that participated in the movement giving rise to the freight revenue. Indeed, NYC deposits such funds in "short-term loans, government securities, [and] things of that nature", keeping the increment earned thereon as its own. It is crystal clear from the testimony in this case that until such time as the AAR rules require the presentation or exchange of drafts for settlement of these interline freight balances, all "terminating" or "settling" railroads treat such funds as their own, and use the same for general corporate purposes, subject only to the duty to account therefor to participating carriers at a specified time. This is the manner in which railroads deal with each other under normal conditions in the settlement of their interline freight balance accounts.

However, when a railroad, such as the Debtor in this case, becomes involved in financial difficulties, other carriers do-

ing business with the "sick" railroad may put it on a "cash" or "prepay" basis, and that is what was done here by NYC. It is undisputed that during the months of February and March, 1967, interline freight balances between the Debtor and NYC reflected a credit in favor of the latter to the extent of $132,073.84. Because of the Debtor's financial condition at that time, no part of these interline freight balances, which had accrued prior to the filing of the reorganization petition on March 22, 1967, were paid, and the same remain unpaid to this day.

On March 22, 1967, this Court entered an order in the reorganization proceedings, paragraph 9 of which reads as follows:

"All persons, firms and corporations, holding collateral heretofore pledged by the Debtor as security for its notes or obligations or holding for the account of the Debtor deposit balances or credits be and each of them hereby are restrained and enjoined from selling, converting or otherwise disposing of such collateral deposit balances or other credits, or any part thereof, or from off-setting the same, or any thereof, against any obligation of the Debtor, until the further order of this Court."

A copy of this order, containing the above quoted provision, was duly served on NYC or its counsel, Mr. Shapiro.

Effective March 27, 1967, NYC published in Leland's Official List of Open and Prepay Stations, I.C.C. A–46, a tariff, controlling on all railroads, which required that all shipments originating or passing over NYC lines for destination on the Debtor's lines would be on a "prepay" basis, and that all shipments originating on Debtor's lines and moving over or terminating on NYC lines, would be on a "collect" basis. As a result of this tariff, NYC has been collecting and is holding, charges for freight shipments which originated or terminated on the Debtor's lines. As to freight that terminated on the Debtor's lines, the charges for such shipments represent funds which, in accordance with established

practice and custom, would normally have been collected by the Debtor and retained and used by its trustees until such time as settlement drafts with respect to said interline freight balances were required to be exchanged with connecting carriers within the time and in the manner prescribed by the AAR rules. Such settlements usually take place on the 18th day following the month of the freight shipment or shipments involved. Generally speaking, however, settlements are effected, by the exchange of drafts, between the 20th and the 25th day of the month following the movement.

As a result of interline freight movements that occurred during the month of April 1967, NYC, under the tariff filed by it on March 27, 1967, collected the freight charges for all participating carriers, including the Debtor, involved in said movements. The Debtor's proportionate share of the money so collected by NYC amounted to $266,858.96. On May 24, 1967, the trustees presented a draft for that amount to NYC, which declined to accept it. Instead, NYC offered to honor a draft only to the extent of $134,785.12 (which figure was later corrected to $137,068.26), and represented the difference between the trustees' draft of $266,858.96, and the interline freight balances owed by the Debtor to NYC for freight shipped during the months of February and March, 1967.

The trustees contend that NYC has no right to offset against the draft of $266,858.96, the items which accrued in favor of NYC prior to the filing and approval of the reorganization petition in this case, and that such action is an attempt on the part of NYC to create an undue preference in its favor and is in violation of paragraph 9 of this Court's order of March 22, 1967. The relief sought by the trustees is to have NYC held in contempt for violation of paragraph 9 of this Court's order of March 22, 1967; enjoined from off-setting obligations on shipments moving prior to the filing of the petition for reorganization, against obligations for shipments moving subsequent to the filing of said

reorganization petition; and to direct NYC to honor the trustees' draft for $266,858.96.

■■ In addition to the controversy concerning the interline freight balances, NYC has also asserted claims against the trustees for per diem car rentals for the month of April 1967 ($71,672.00), and for car repairs for the same month ($2,477.37). Drafts drawn for these amounts on the trustees have not been paid. The parties agree that these transactions give rise to a debtor-creditor relationship. However, as to the interline freight balances, NYC takes the position that such balances are "trust funds", and that if settlement is not made in accordance with the "mandatory" provisions of the AAR rules,[1] such funds remain the property of the railroad which earned its proportionate share thereof in the hands of the railroad which collected the entire charge. NYC argues that it should be obliged to pay to the trustees only the net remaining after it has withheld from such funds the share belonging to it, and that the balance should be paid into court for distribution to the other carriers which participated in the movement.[2] In support of its "trust fund" theory, NYC cites Section 1, paragraph 4, of the Interstate Commerce Act, 49 U.S.C.A. § 1(4), which imposes upon railroads the duty to furnish transportation, establish through rates, and arrange for a division of joint rates. This provision of the Interstate Commerce Commission Act does not create a trust relationship, but at most, under appropriate circumstances, permits invocation of the so-called "6 months rule". See Southern Railway Company v. Flournoy, 301 F.2d 847 (4 Cir. 1962).

If interline freight balances are not technically trust funds, then NYC contends that rates earned jointly partake of a "fiduciary character" when they are in the hands of the railroad that has furnished a part of the joint service, and that such funds being the proceeds of such joint transportation, are properly accountable for in equity. NYC also alleges that it has not violated paragraph 9 of this Court's order of March 22, because the language of said paragraph does not apply to the facts of this case. Moreover, NYC objects to the use of the term "set-off" in the context in which it is used by the trustees. In this connection, NYC takes the position that all that is involved here is a "running account" against a wrongful holder of NYC funds, and that the "netting out" of these funds is not the exercise of a "set-off", but rather a simple settlement for funds that should have been made at a required time. Other defenses asserted by NYC, including failure of the

---

1. References to the AAR rules may be found at pages 10 through 17, and 21 through 27 of the transcript of the hearing. The pertinent rule, appearing in the transcript at page 43, is Rule 149, and reads as follows:

    "The settling carrier shall pay to each intermediate carrier its proportion of the interline freight revenue, whether the freight charges are prepaid or collect, advances and prepaid to be included in the settlement with the waybilling carrier. Settlements shall be made on net balances which shall be immediately subject to sight draft, except where special arrangements are made between the interested carriers."

2. At the hearing of this case, NYC offered to pay into the Registry of the Court, but not to the trustees, the sum of $137,068.26. The trustees objected on the ground that this did not represent the full amount due, unless it was tendered to and could be accepted by them, without prejudice to their right to the balance NYC did not recede from its position and under the circumstances, the Court declined to permit the money to be deposited under the offer as made. It is interesting to note at this point, as previously mentioned, that in making the offer to pay the money into court, NYC expected the Court to distribute to other connecting carriers who participated in the freight movements, their proportionate shares of the freight revenue. One of the exhibits in evidence (T–1), shows that out of the $266,858.96 claimed by the trustees, only $1,738.75 would have been distributable to the other carriers not yet paid, and that these railroads made no claim in court for their respective shares.

trustees' petition to set forth a claim upon which relief may be granted, inequitable conduct on the part of the trustees, this Court's lack of jurisdiction to dispose of the matter on a summary application, have all been considered by the Court and found to be without merit.

Regardless of the nomenclature NYC elects to use, the basic issues involved are whether or not the proportionate share of interline freight charges that accrued to the credit of NYC prior to the filing of the petition for reorganization herein on March 22, 1967, may be deducted from, retained by, or set-off by NYC against the proportionate share of freight revenues earned by the trustees after the reorganization petition was filed. If the answer to this is in the negative, the next question to be answered is whether or not NYC may set-off against the trustees' draft of $266,-858.96, the claim for the per diem car rentals and car repairs (which transactions took place in April 1967) totalling $74,149.37. Upon a consideration of the entire record, the Court finds and concludes that such set-offs may not be made.

■ As to this Court's jurisdiction, it should be noted that the hearing in this case was not "summary" in the manner alleged by NYC. An answer and an amended answer to the trustees' petition were filed by NYC and a full hearing on the issues raised thereby took place on June 26, 1967. The transcript of the hearing speaks for itself. There is no doubt that the Court under the circumstances here present could have exercised summary jurisdiction. The powers of a court and its summary jurisdiction in matters arising in cases of this kind is fully set forth in Continental Illinois Nat'l Bank & Trust Co. of Chicago v. Chicago, Rock Island & Pacific Railway Company, 294 U.S. 648, 55 S.Ct. 595, 79 L.Ed. 1110 (1935). That case also points up the different factors that should be considered between a straight bankruptcy and a reorganization under section 77 of the Bankruptcy Act. See also, Susquehanna Chemical Corp. v. Producers Bank & Trust Co., 174 F.2d 783 (3 Cir. 1949).

Dealing first with the claimed right of set-off on the car rental and car repair bills, there has been no showing that a state of insolvency actually exists in this case. A set-off may well create an undue advantage to a creditor and jeopardize rehabilitation in a reorganization proceeding. The right to a set-off depends upon the facts of each case. In re Chicago & N. W. Ry. Co., 18 F.Supp. 932 (N.D.Ill.1936), the court prevented the Reconstruction Finance Corporation from converting certain collateral into cash, which action would have had the effect of preferring some creditors and possibly result in jeopardizing the plan of reorganization. The court rejected the argument advanced by the Reconstruction Finance Corporation that "[u]nless a sale of pledged securities would so hinder, obstruct or delay the preparation and consummation of a plan of reorganization under section 77 as probably to prevent it, the court is without jurisdiction to restrain the sale."

■ The right to set-off is governed by federal law and in a consideration of the problem the differences between straight bankruptcies and reorganizations must be kept in mind. As was so well stated in the *Susquehanna* case, supra, at pages 786 and 787 of 174 F.2d:

"In considering whether the application of a set-off provision is inconsistent with the purpose of the reorganization chapter it must be kept in mind that there is a sharp difference between straight bankruptcy proceedings and those for reorganization. In bankruptcy the object is to liquidate the assets of the bankrupt, to pay off his creditors as quickly and inexpensively as possible and to free the bankrupt from the burden of accumulated debt so that he may begin his business life anew. But the purpose of reorganization is not liquidation at all. If reorganization is successful the debtor corporation will continue to function, to pay its creditors, and carry on its

business. The purpose of reorganization is to save a sick business, not to bury it and divide up its belongings.

"It is quite evident that the application of the unqualified right of set-off might be enough, without more, to defeat the purpose of reorganization. As Finletter [Finletter, The Law of Bankruptcy Reorganization 306 (1939)] says on the subject: 'It is not appropriate to use the same rule of set-off as is applied in a liquidation. To do so may deprive the debtor, for no equitable reason, of all or a large part of its current assets at a time when it needs them most and may frustrate the purpose of the Act.' "

The court goes on to say: .

"Recognition of the important differences between straight bankruptcy and reorganization has led both the courts and textbook writers to say that the compulsory application of Section 68 [11 U.S.C.A. § 108 of the Bankruptcy Act dealing with 'Set-offs and Counterclaims'] to all reorganization cases would not be consistent with provisions of the chapter [footnote omitted]. In other words, sometimes the set-off rule of Section 68 is to be applicable; at other times it is not. Whether it is or not depends upon the equities of the situation. To support this conclusion we have not only the textbook writers, but also the Supreme Court in Lowden v. Northwestern National Bank, 1936, 298 U.S. 160, 56 S.Ct. 696, 80 L.Ed. 1114. We think that this decision plus the other authorities cited in the footnote show beyond doubt that the reorganization court is not bound to apply, willy-nilly, the set-off rule of Section 68 of the Bankruptcy Act. The criteria to be applied are given by the Supreme Court in the Lowden case. They include the value of the assets, the temporary or permanent duration of the debtor's inability to pay its debts as they mature, the superior liens, if any, to that of the creditor seeking set-off, and any understanding between the parties that the deposits were to be used to cancel the debtor's obligation."

■ In the case at bar, as already mentioned, the petition for reorganization was filed and approved on March 22, 1967. The trustees were appointed on April 11, confirmed by the Interstate Commerce Commission, and qualified on April 25. Since then much has been done in furtherance of the attempt to reorganize the Debtor. Property no longer needed for corporate purposes has been sold; contracts deemed beneficial to the Debtor have been affirmed, others disaffirmed; deficits resulting from passenger service have in part, and continue to be, subsidized by state funds; the State of New Jersey has contracted to purchase Trustees Certificates to the extent of $2,000,000.00; the Debtor participates in the so-called Aldene Plan, which should materially reduce operating expenses; steps have been, and are being taken, to increase efficiency of service and bring in additional revenues. Admittedly much remains to be done, but present circumstances are such that to permit set-offs of the nature attempted in this case would deprive the Debtor of revenue at a time when such revenue is sorely needed, and might well jeopardize the chances of effecting a rehabilitation of the Debtor. A consideration of these and other factors compel the conclusion that the requested set-off for car rentals and repairs should not be allowed.

■ What has thus far been said concerning the right of set-off with respect to the claims of NYC for car rentals and repairs, applies with equal force to the attempted set-off in the matter of the interline freight balances unless such are in fact, as alleged by NYC, trust funds. That they are not trust funds is clear. The relationship among the several carriers engaged in an interline freight movement is that of debtor and creditor. The AAR rules create no other relationship. See in this connection In re Chicago Express, Incorporated, 222 F. Supp. 566 (S.D.N.Y.1963), aff'd 332 F.2d 276 (2 Cir. 1964). While the interline freight balances are not trust funds, they

may be entitled to preferential treatment under the so-called 6 months rule, provided there is a compliance with the requirements thereof. See Southern Railway Company v. Flournoy, 301 F.2d 847 (4 Cir. 1962); In re Chicago Express, Incorporated, supra.

█ This Court is of the opinion that the trustees' petition sets forth a claim upon which relief can be granted; that this Court has jurisdiction over the parties and subject matter involved; and that the trustees have not violated any principles of equity that would justify a denial of the relief sought herein.

█ As to paragraph 9 of this Court's order of March 22, a fair reading thereof leads to the conclusion that the set-off attempted by NYC in connection with the interline freight balances is in violation of said order.

Upon a consideration of the entire record in this case, the Court is satisfied that NYC should pay to the trustees the full sum of $266,858.96, without any set-off for the interline freight balances owing to NYC for the February and March, 1967 movements, and without any set-off for the April car rentals and repairs.

It is, therefore, on this 21st day of September, 1967,

Ordered, that the respondent herein, The New York Central Railroad Company, pay to, or honor a draft drawn upon said respondent, for $266,858.96, and that it be enjoined from setting-off against said sum of $266,858.96, any money claimed to be due for the interline freight balances in favor of said respondent for freight movements which took place in February and March, 1967, and for car rentals and repairs for the month of April 1967; and it is

Further ordered, that the trustees' application to hold respondent in contempt for violation of paragraph 9 of this Court's order of March 22, 1967, be denied, without prejudice to a renewal thereof if respondent fails to comply with the terms hereof within ten (10) days after receiving notice of the entry of this order, such notice to be given to respondent within two (2) days from the date of entry of this order by counsel for the trustees.