In the Matter of **TENNESSEE CEN-TRAL RAILWAY COMPANY,** Debtor.

**No. BK 67–2263.**

United States District Court, M. D. Tennessee, Nashville Division.

Aug. 19, 1970.

Supplemental Opinion Aug. 27, 1970.

William D. Ruckelshaus, Asst. Atty. Gen., and Paul A. Sweeney, Special Asst. Atty. Gen., Washington, D. C., Charles H. Anderson, U. S. Atty., and Ames Davis, Asst. U. S. Atty., Nashville, Tenn., for the United States.

Wilson Sims, of Bass, Berry & Sims, Nashville, Tenn., for Koppers Co.

Duncan B. Phillips, Washington, D. C., for Southern Railway.

Lowell H. Jacobson, Westbrook, Jacobson & Branovik, Chicago, Ill., for Chicago Freight Car Leasing Co.

Lawrence Dortch, of Waller, Lansden, Dortch & Davis, Nashville, Tenn., for Humble Oil & Refining Co.

·David M. Keeble, of Hooker, Keeble, Dodson & Harris, Nashville, Tenn., for Connecting Carriers.

David M. Keeble, of Hooker, Keeble, Dodson & Harris, Nashville, Tenn., and W. F. Bunn, Gen. Counsel, Chicago, Ill., on the brief, for Illinois Central Railroad Co.

David M. Keeble, Nashville, Tenn., Roy Sherman and Phillip M. Lanier, Louisville, Ky., on the brief, for Louisville & Nashville Railroad Co.

Carmack Cochran, Nashville, Tenn., for A. Battle Rodes, Trustee.

Ogden Stokes, Nashville, Tenn., for Metropolitan Government of Nashville and Davidson County.

Daniel Seay, Lebanon, Tenn., for Wilson County [Taxing Authorities].

## OPINION

WILLIAM E. MILLER, Circuit Judge, sitting by designation.

On September 22, 1969, the Trustee of the Tennessee Central Railway Company, Debtor, petitioned this Court for a hearing on the division of stockholders and creditors into classes according to the nature of their claims, and a determination of the order of priority of such claims. A hearing on these issues was held on November 10, 1969.

The history of this action, which is concerned with the reorganization and then the liquidation of the assets of the Tennessee Central Railway Company, will be found in this Court's opinion in In re Tennessee Central Railway Company, 304 F.Supp. 789 (M.D.Tenn., 1969).

There are four categories of creditors claiming all or a portion of the distributable assets of the Tennessee Central:

1. The United States Government, holder of the Tennessee Central's first mortgage bonds, secured by an indenture of mortgage.

2. Various railroads and other related companies claiming recovery for interline balances accruing within the period of six months before filing of the reorganization petition.

3. Municipalities and counties claiming recovery for back taxes for periods prior to the filing of the reorganization petition.

4. Suppliers of cross-ties and diesel fuel to the Tennessee Central during the six months before the filing of the reorganization petition.

The present assets of the Tennessee Central, both in cash and in property not yet sold, total approximately $3,000,000. The claim of the government totals over $5,500,000. The claims of the carriers, and others claiming priority under the six-months creditors rule, total approximately $1,200,000. The various tax claims total over $80,000, and there are other suppliers' claims of more than $100,000.

Obviously, if the United States is given first priority in the recovery, its claim will consume all assets, and there will be no need to determine additional priorities.

Case law on the issues here presented is far from settled. While there are a few Supreme Court cases which touch upon relevant points, most of the published opinions are at the district court level. On some issues, conflicts exist among the circuits.

These reorganization proceedings are governed by the provisions of Section 77 of the National Bankruptcy Act, 11 U.S.

C. § 205. If may be helpful at this point to quote from a general analysis of Section 77 contained in 5 Collier on Bankruptcy (14th ed.) ¶ 77.02:

> Stated briefly, § 77 has for its main purpose "the rehabilitation of the debtor by a readjustment of its financial structure in the interest of the debtor and its creditors and security holders, under a fair and equitable plan of reorganization which shall so modify or alter the rights of both secured and unsecured creditors that the fixed charges shall be brought within the probable future earnings available for the payment thereof." During the process of reorganization, the section contemplates the continued corporate existence of the debtor under the control and supervision of the court. Although § 77 does not depart from the general theory of the Bankruptcy Act that one of the main purposes is to permit the creditors to share in the debtor's assets, yet it should be borne in mind that the section reflects a public policy that the operation of railroads as sound, economic units should be achieved for the benefit of the public, regardless of the interests of creditors and stockholders. It has been vividly stated that under § 77 "the reorganized road shall be a living, not a dying, railroad enterprise." [Footnotes omitted.]

Although no formal plan of reorganization has been filed during the proceedings, substantial compliance with the purposes of the act has been obtained. Virtually all of the Tennessee Central's line is now being operated by three other railroads, to whom portions of the bankrupt road were sold. Service has been maintained virtually to all areas previously served by the Tennessee Central. Since some of the claimants here have participated in the maintenance of service, the Court must take into consideration all factors which have contributed to this continuation of service.

■ The United States asserts a priority for its mortgage bonds under 31 U.S.C. § 191, a provision giving the United States a first priority in the assets "[w]henever any person indebted to the United States is insolvent. * * *" This is a general provision which has been in effect, substantially unchanged, since 1797. It has been held that this provision is inapplicable in conventional bankruptcy proceedings. Adams v. O'Malley, 182 F.2d 925 (8th Cir. 1950); see In re Taylorcraft Aviation Corp., 168 F.2d 808 (6th Cir. 1948) (dictum); United States v. First National Bank & Trust Co., 386 F.2d 646 (8th Cir. 1967) (dictum). The United States contends, however, that its priority under 31 U.S.C. § 191 is to be afforded first position among the claimants by virtue of Section 77(b) of the National Bankruptcy Act, 11 U.S.C. § 205(b). Specifically, the last paragraph of section 205(b) provides in part:

> For all purposes of this section unsecured claims, which would have been entitled to priority if a receiver in equity of the property of the debtor had been appointed by a Federal court on the day of the approval of the petition, shall be entitled to such priority and the holders of such claims shall be treated as a separate class or classes of creditors.

As noted above, the general priority of the United States in the assets of its insolvent debtors does not apply in bankruptcy cases, and the same priority may not be integrated into the Bankruptcy Act to create priorities for the Government that are not placed there by Congress. See Davis v. Pringle, 268 U.S. 315, 45 S.Ct. 549, 69 L.Ed. 974 (1925) (claim under 31 U.S.C. § 191 not due priority in bankruptcy by integration with section 64 of the Act). Furthermore, section 205(b), supra, does not apply to secured claims. The government states in its Memorandum that:

> The debts due the United States by the Debtor insofar as they are based upon the notes now in excess of $5,500,000 were secured by a pledge of all the Debtor's first mortgage bonds. The mortgage bonds in turn were secured by a mortgage upon all of the

Debtor's property both real and personal. [Memorandum at 9, 10]

It would appear that the claim of the United States is a secured claim and thus expressly excluded from section 205(b), which grants priority to certain unsecured claims only. The United States contends, nevertheless, that the restriction of 11 U.S.C. § 205(b) to "unsecured claims" does not bar its secured claim from the same priority. With this conclusion the Court is unable to agree.

It is further contended on this point that proceedings under the railroad reorganization sections of the National Bankruptcy Act are a substitute for reorganization under an equity receivership. See 5 Collier, Bankruptcy ¶ 77.02 (14th ed.) Thus, it is argued that the instant proceeding is akin to reorganization under an equity receivership and that the proper conditions thus arise for recognizing a claim under 11 U.S.C. § 205(b) as the Government has argued. Whether the United States under this theory would be entitled to a priority for an unsecured claim in this proceeding by virtue of section 205(b) need not be decided. For, as pointed out, section 205(b) is inapplicable to secured claims like that of the United States.

The assertion of a first priority in the United States under 31 U.S.C. § 191 is further attacked by the carriers presenting claims upon the authority of 15 U.S.C. § 603, which declares that debts due to the Reconstruction Finance Corporation (RFC) should not be afforded any statutory priority otherwise available to the United States. The carriers urge that this provision prohibits the United States from asserting the debts owed by the Debtor to the RFC as a basis for priority under 31 U.S.C. § 191. The statute relied on by the carriers was repealed by Congress in 1966. [Pub.L. 89–554, § 8(a), Sept. 6, 1966, 80 Stat. 648, 654–55.] The purpose behind the original statute is plain. Loans such as the one made to the Debtor by the RFC were intended to keep firms in desperate financial condition in business. These were to be considered regular commercial loans, and were to be treated accordingly in insolvency proceedings. It seems clear that if the Tennessee Central proceedings had occurred prior to the repeal of 15 U.S.C. § 603 in 1966 there could be no question that the United States would have no priority by virtue of debts owed to the RFC. Inasmuch as 31 U.S.C. § 191 is inapplicable to bankruptcy proceedings, however, the result is still the same, and the Court can only speculate as to why the Congress would repeal the statute and enable the United States to have a debt priority in other cases that it had not enjoyed for thirty years.

The United States next contends that if its claim under 31 U.S.C. § 191 is denied, it is still entitled to be paid ahead of all other claimants by virtue of the mortgage lien which it has upon the property of the Tennessee Central. In opposition, the carriers answer that their claim is an equitable one, cognizable under the so-called "six-months creditors" rule, and should therefore come ahead of any claims which the United States might advance.

The six-months rule is a creature of equity. It was developed in railroad equity receiverships in the late 19th century, and was designed to guarantee the payment of funds to certain creditors to whom the railroad in receivership had become indebted during the six months prior to the inception of the receivership. As the United States notes in its trial brief, "many inconsistencies exist among the lower courts' decisions in dealing with the rule."

There is no cut-and-dried "six-months" rule. The Supreme Court has stated:

It is apparent from an examination of the above cases [dealing with the six-months rule] that the decision in each one depended on its special facts. This court has uniformly refrained from laying down any rule as absolutely controlling in every case. * * * Southern R. v. Carnegie Steel Co., 176 U.S. 257, at 284–285, 20 S.Ct. 347, 357–358, 44 L.Ed. 458 (1900).

One oft-quoted formulation of grounds for application of the rule appears in Guaranty Trust Company of New York v. Albia Coal Company, 36 F.2d 34, at 35 (8th Cir. 1929):

(1) That the consideration for the claim was a current expense of ordinary operation of the railroad, necessarily incurred to keep it a going concern.

(2) That the claim represents a debt contracted with the expectation or intention of the parties that it was to be paid out of the current earnings of the railroad.

(3) That the claim shall have accrued within six months prior to the appointment of the receiver.

In considering application of the six-months rule, it must be noted that the special facts of the Tennessee Central case make it unique, and not altogether analogous to other railroad reorganization proceedings. For some time prior to the filing of the reorganization petition the Tennessee Central had been in serious financial difficulties. The railroad showed operating losses in 1964, 1965, 1966, and 1967. Shortly before the railroad entered reorganization, it appeared to officers and directors of the Tennessee Central that it would be possible to obtain outside financial help to put the road on a sound footing once again, and enable it to pay off its quite considerable debt to the United States.

Of particular interest is the help the Debtor received in handling its interline freight balances. The interline freight balances for which the carriers assert priority under the six-months rule are not a portion of the Debtor's income which is owed the carriers for services rendered, but are rather funds which the Debtor collected for other carriers shipping over its lines, and are held by the Debtor only as a type of collection agent for the carriers.

According to affidavits submitted by the various carriers, officials of the Tennessee Central contacted the carriers and asked that the railroad's interline accounts not be placed on a "pre-paid" basis until the road filed its petition in reorganization. Operating on a "pre-paid" basis requires a greater degree of liquidity than financing on the "collect" basis. When freight is shipped over two or more railroads on a "pre-paid" basis, the shipper is required to pay at the point of origin all charges due any railroad which will handle the shipment. The usual method of handling rail freight, payment on the "collect" basis, allows the carrier at the point of destination to collect all charges. On the following month the railroads determine the net amount due from one road to another, and payment is made.

Robert H. Smith, treasurer of the Southern Railway Company, states in his affidavit:

Money that is collected for another road is *not* treated as freight revenue (income) by the collecting road. On the other hand, it is not segregated and placed in a separate account, but is mingled with and used as working capital of the collecting road. * * * Any change in the usual practice by the railroad is likely to disrupt normal business relationships and cause serious inconvenience and expense to shippers and consignees.

It is clear that the Tennessee Central would have been placed in serious financial difficulties if all shipments which it handled were placed on a "pre-paid" basis by other carriers.

If the Tennessee Central had been forced to shut down its operations completely, it is a fair inference from this record that it would not have been possible for the trustee in reorganization to effectuate the sale of almost all of the road's line to the other three carriers which now operate it except possibly at a much reduced sales price. Once shippers had been forced to use means of transportation other than the railroad, they would have been reluctant to return to the railroad. As this Court has stated previously, the primary purpose of the Railroad Reorganization Act is to keep existing railroad lines in operation when-

ever possible. *See* In re Tennessee Central Railway Company, Debtor, *supra.*

Two cases decided within the last ten years are advanced by the parties hereto as instructive on the issues presented here in deciding priorities among the various claimants. These are Southern Railway Company v. Flournoy, 301 F.2d 847 (4th Cir. 1962) and In re New York, New Haven & Hartford Railroad Company, 405 F.2d 50 (2d Cir. 1968), cert. denied, 394 U.S. 999, 89 S.Ct. 1592, 22 L. Ed.2d 776. The United States cites the *New Haven* case in support of its priority, while the carriers place great reliance on the *Flournoy* opinion, and attempt to distinguish it from *New Haven.* The two cases are generally concerned with the competing priorities, in railroad reorganization proceedings, of six-months creditors and secured claimants, such as mortgagees and bond holders.

In the *New Haven* case, several unsecured creditors filed claims for services, parts and supplies, and sought a priority in payment under the six-months rule. The Court stated:

> Whether the six months creditors receive priority depends, however, on whether there existed a "current debt fund" or "current expense fund" from which payment could have been made but which was used instead for the benefit of the bondholders. The reasoning behind the requirement of the current expense fund is that the six months claims deserve priority only to the extent that the claimants relied in extending credit on the availability of current income and not, along with others, on the railroad's general credit standing. In re New York, New Haven and Hartford Railroad Company, *supra,* at 52.

The reasoning is that six-months creditors should be allowed a priority only to the extent that there existed a fund available for their payment which was diverted to the benefit of other creditors.

This rule was stated earlier by the District Court in the *New Haven* case in terms of providing a remedy to the six-months claimants when funds were improperly paid out on the mortgage debt before payment was made to current creditors whose extension of credit made continued operation of the road a possibility and thus benefitted the mortgagees. The Court stated:

> Revenues accruing from operations should be paid first to the operations creditors whose materials and services made those revenues possible; and only after all such operational claims have been paid, should the balance be available for the benefit of the mortgagees. If any operating revenues do improperly get into the hands of the mortgagees, equity requires that those revenues be restored to the operations creditors by the mortgagees yielding them a priority. In re New York, New Haven & Hartford Railroad Co., 278 F.Supp. 592, 597–598 (D.Conn. 1967).

In the *Flournoy* case the Court ordered that a priority be given to the payment of interline balances, saying:

> Interline charges are, of course, contained in current revenues. * * * Such transportation is art and part [sic] of our national railroad system. Indeed, it is compelled by statute. 49 U.S.C.A. § 1, et seq.
>
> * * * * * *
>
> With the District Court we agree that interline accounts are an equitable lien on the railroad properties and outrank the mortgages. Southern Railway Company v. Flournoy, *supra* at 854.

The Fourth Circuit justified the payment of the interline traffic balances on the theory that if such accounts had not been paid, the other lines would have demanded payment, by placing the line on a "pre-paid" basis, thereby threatening the railroad's financial condition.

Neither the *New Haven* nor the *Flournoy* opinion seems to include a consideration of the true nature of these interline balances. The money collected by the Tennessee Central could not reasonably be considered a portion of its "op-

erating revenues." The funds were not payment for any service rendered, or any goods sold, but monies rightfully due the carriers seeking priority. It is payment from shippers for haulage over the lines of these railroads which extended credit to the Tennessee Central.

There is no argument, however, that the Tennessee Central held these funds in trust for the other carriers. In In re the Central Railroad Company of New Jersey, 273 F.Supp. 282 (D.N.J.1967), aff'd per curiam, 392 F.2d 589 (3rd Cir. 1968), the Court stated, regarding the nature of interline freight balances:

> That they [the interline freight balances] are not trust funds is clear. The relationship among the several carriers engaged in an interline freight movement is that of debtor and creditor. The AAR [American Association of Railroads] rules create no other relationship. * * * While the interline freight balances are not trust funds, they may be entitled to preferential treatment under the so-called six-months rule, provided there is a compliance with the requirements thereof. *See* Southern Railway Company v. Flournoy, 301 F.2d 847 (4th Cir. 1962). [Some citations omitted]. In re The Central Railway Company, 273 F.Supp. at 288–289.

Thus, although the funds are not held in trust, the carriers can be said to have an equitable right to a priority in their recovery, if all other requisite requirements are met.

There is confusion among the parties seeking priority over the United States as to whether the six-months rule, or another rule, "the necessity of payment" rule, should be used to obtain the asserted priority. The Government resists assertion of either rule in behalf of other claimants. The rules differ only slightly in character. The necessity of payment rule was first enunciated in Miltenberger v. Logansport Railway Company, 106 U.S. 286, 1 S.Ct. 140, 27 L.Ed. 117 (1882), and is founded upon the theory that the payment of certain claims by the receiver or trustee may be necessary to the continued operation of the railroad, not, as in the six-months rule, that the payment is supported by equities in that they enabled continued operation, though perhaps not absolutely necessary. Mr. Justice Holmes stated in Gregg v. Metropolitan Trust Company, 197 U.S. 183, 187, 25 S.Ct. 415, 416, 49 L.Ed. 717 (1905): "The ground of such allowance as was made [in *Miltenberger*] was not merely that the supplies were necessary for the preservation of the road, but that payment was necessary for the business of the road,—a very different proposition."

In opposing application of the six-months rule, the United States contends that, under the rule, there must have been some diversion of funds from the operating revenues to the benefit of the mortgagees before the mortgaged corpus of the railroad can be charged with debts due the six-months creditors. This proposition was first set out in Fosdick v. Schall, 99 U.S. 235, 25 L.Ed. 339 (1878), and was recently restated in In re New York, New Haven and Hartford Ry. Co., *supra.* The Supreme Court noted in Southern Ry. Co. v. Carnegie Steel Co., 176 U.S. 257, 285, 20 S.Ct. 347, 358, 44 L.Ed. 458 (1900): "[W]hen current earnings are used for the benefit of mortgage creditors before current expenses are paid, the mortgage security is chargeable in equity with the restoration of any funds thus improperly diverted from their primary use." Many courts, however, have taken the view that it is not necessary to show any diversion of income, especially where is can be amply demonstrated that the railroad has derived some benefit from the services rendered by the creditors claiming an equitable priority. In Southern Ry. Co. v. Flournoy, *supra*, the Court stated:

> [W]e think income diversion to mortgage is not the sine qua non of corpus invasion where there are found—as special circumstances—all elements constituting the pre-eminent equity. * * * Throughout them [cases discussing priorities and income diver-

sion], however, runs the acknowledgment that, in special circumstances * * *, the general creditor partakes of liened capital assets ahead of the mortgagee. *Id.,* 301 F.2d at 851.

Two Sixth Circuit cases, both more than sixty years old, touch upon the subject of priorities in railroad bankruptcy proceedings. *Gregg v. Mercantile Trust Co.,* 109 F. 220 (6th Cir. 1901); and *Gregg v. Metropolitan Trust Co.,* 124 F. 721 (6th Cir. 1903), aff'd 197 U.S. 183, 25 S.Ct. 415, 49 L.Ed. 717 (1905). Neither case is concerned with what priority should be afforded to the payment of interline traffic balances, but the Court stated in the *Mercantile Trust* case, *supra,* 109 F. at 229:

> It is plain that the payment of car-trust obligations by the railroad company enhanced the interest of the mortgagees in such equipment. To the extent that such prior obligations were paid off, the mortgagees were benefitted. Debts incurred for the purpose of making additions to the permanent equipment and motive power of a mortgaged railroad are not current operating expenses for supplies or materials, and are not preferential debts. If such debts would not be preferential debts if unpaid, their payment out of a fund primarily applicable to such debts is a diversion which the bondholders must make good if they were thereby benefited. [Citations omitted].

Thus, the Circuit Court was of the opinion, even then, that any expenditure which benefitted the mortgagees was ipso facto a diversion, and payment thereof out of the mortgaged corpus is proper.

In the *Metropolitan Trust* case the Court of Appeals had established a claim for ties sold to a railroad in receivership as a six-months claim, but held that the claim could not be paid from the fund held by the receiver. The Supreme Court affirmed, but, after finding that there had been no diversion of income to the benefit of mortgagees, stated the issue as "whether in such a case a claim for necessary supplies furnished within six months before the receiver was appointed, should be charged on the corpus of the fund." 197 U.S. at 186, 25 S.Ct. at 416. Finding "no special circumstances" or "equity" favoring the suppliers, the Court refused to charge the fund for the claims of suppliers ahead of the mortgagees. 197 U.S. at 186, 190, 25 S.Ct. at 417. The Court thus seems to indicate that where there are special circumstances or equities favoring six-months claims, even in the absence of a diversion of income to the benefit of secured creditors, such claims might be allowed a priority in the assets.

The United States contends that the lack of any income for a lengthy period prior to the filing of the Tennessee Central's reorganization petition should have put the carriers on notice that there was no "current operating fund" from which these interline traffic balances could be paid. The carriers allege that their extension of credit, by handling the Debtor's interline balances on a "collect" basis—unique to the operation of railroads—enabled the Tennessee Central to continue in operation through difficult financial straits, preserving the railroad as a "going concern" and facilitating the continuation of rail service to the vast majority of the area previously served by the Tennessee Central.

The equities in this case favor the priority of the carriers. Their extension of credit preserved the corpus of the mortgaged railroad by maintaining it as a "going concern," and at the same time enabled the area formerly served by the Tennessee Central to enjoy continued rail service, thereby carrying out the expressed purposes of the railroad reorganization section of the National Bankruptcy Act.

Therefore, the Court concludes that the carriers claiming priority under the six-months rule for interline freight balances should be given a priority over the United States, holder of the Debtor's bonds and a mortgage on its property. Application of the six-months rule in this matter follows the criteria set forth

in the *Flournoy* case, *supra*, and others. The maintenance of service through the carriers extension of service was of benefit to the mortgagee, and hence their balances should be paid just as if some physical diversion of monies from current revenues had been of benefit to the mortgagee.

■ The United States is entitled to no statutory priority in this railroad reorganization action. Its claim is secured by the corpus of the mortgage, and it stands in this case as would any other bondholder or mortgagee. As the Court stated in In re Chicago Express, Inc., 222 F.Supp. 566 (S.D.N.Y.1963), aff'd 332 F.2d 276 (2d Cir.), cert. denied 379 U.S. 879, 85 S.Ct. 146, 13 L.Ed.2d 86 (1964): "Where Congress intended that special priorities be granted, 'it has carefully enumerated them and any omissions must be construed as express exclusions * * *' ". [citations omitted]. 222 F. Supp. at 571.

Another group of claimants seeking priority under the six-months rule includes three firms which leased freight cars to the Tennessee Central. The statement by these firms that the Tennessee Central operated with only six or seven freight cars of its own, leasing the remainder, is unchallenged by the United States. According to the brief of one of the leasing companies, the Tennessee Central was almost unique in this respect, in that it operated almost totally with leased cars.

In its brief the United States says simply, "Finally items such as car rentals are not allowable," citing Thomas v. Western Car Co., 149 U.S. 95, 13 S.Ct. 824, 37 L.Ed. 663 (1893), and In re Chicago and N. W. R. Co., 110 F.2d 425 (7th Cir. 1940).

Louis O. Sloss, secretary-treasurer of the Chicago Freight Car Leasing Company, one of the leasing claimants, states in his affidavit that the firm allowed the Tennessee Central to continue the use of the cars for a six-month period prior to the filing of the petition in reorganization in reliance on the six-months priority rule. Sloss also stated that if Chicago Freight Car Leasing had recalled all the cars upon the cessation of payment, in July, 1967, the Tennessee Central would have been unable to operate.

In the *Thomas* case, *supra*, the Court disallowed the granting of priority to the car rental firm there involved, saying:

[T]he principal officers of the car company were in control of the railroad company and its operations, and must be treated as having full notice of the financial condition of the railroad company, and as having leased the cars to it in reliance upon its general credit, rather than in expectation of displacing the priority of mortgage liens. Thomas v. Western Car Co., *supra*, at 112, 13 S.Ct. at 831.

The Court also stated:

The case of a corporation for the manufacture and sale of cars, dealing with a railroad company, whose road is subject to a mortgage securing outstanding bonds, is very different from * * * those who furnish, from day to day, supplies necessary to the maintenance of the railroad.

\* \* \* \* \* \*

In the present case it appears, in the contract between the car company and the railroad company, that the former reserved the express right to terminate the contract and demand possession of the cars forthwith upon any failure by the railroad company to promptly pay the interest or the principal of any of its bonds or other liabilities. 149 U.S. at 112, 13 S.Ct. at 831.

The *Thomas* case was, of course, decided long before the enactment of the railroad reorganization section of the National Bankruptcy Act, the purpose of that act being to keep existing railroads in operation. If, as the Court suggests in *Thomas*, the freight car leasing companies in this case had withdrawn their cars at the first sign of financial difficulties, the Tennessee Central would have been forced to suspend operations immediately.

In the *Chicago* case, there is no showing that the Pullman cars there in issue were necessary to the operation of the road. Also the controversy involved not the payment of actual rental for the cars, but the lighting and mileage charges on them. Moreover, the cases seem to draw a distinction between "car rentals" and "materials and supplies." *See* In re Chicago & N. W. R. Co., *supra*, 110 F.2d at 431. In the case of the Tennessee Central, operating almost wholly with leased cars, the leasing of these cars should be treated as analogous to buying "materials and supplies."

■ In any case, the central point is whether the goods or services supplied by the creditor seeking priority under the six-months rule were necessary for the continuation of service on the debtor railroad. Without any doubt, the Tennessee Central could not have operated at all without the freight cars which it leased from the Chicago Freight Car Leasing Company, Trailer Train Company, and American Refrigeration Transit. Therefore, these companies are entitled to the same priority under the six-months rule as the carriers seeking recovery of interline freight balances.

■ Several municipalities and counties along the line of the Tennessee Central have filed claims for taxes, and the interest and penalties thereon, for the years 1966 and 1967. The Court has already determined that the United States is entitled to no priority under 31 U.S.C. § 191, and that the United States stands in the position of any bondholder and mortgagee in a similar case. It must now be determined whether these governmental units are entitled to recovery of the taxes against the corpus of the mortgage, whether these taxing units will be allowed to recover interest and/or penalties, and what priority should be given to such recovery, if granted.

Tennessee law provides:

The assessed taxes on all real estate, personalty, railroad, telegraph, and telephone, and other public service companies, and all damages and costs accruing thereon, shall be and remain a first lien upon such property, from the tenth of January of each and every year, for the taxes of that year. Tenn. Code Ann. § 67–1801.

Tennessee law is applicable on this point, and therefore, taxes should be accorded first priority in recovery, ahead of the six months creditors, if it is determined that under the provisions of the National Bankruptcy Act, this Court has jurisdiction to approve the claim.

The Supreme Court said in Gardner v. New Jersey, 329 U.S. 565, 67 S.Ct. 467, 91 L.Ed. 504 (1947):

We think, contrary to the position of New Jersey, that the reorganization court has jurisdiction over the proof and allowance of tax claims and that the exercise of that power was not a suit against the state. * * * We find not the slightest suggestion that Congress left out the large class of tax claims which recurringly appears in reorganizations and often assumes, as here, large proportions. 329 U.S. at 572–573, 67 S.Ct. at 471.

The National Bankruptcy Act contains a provision disallowing claims of states or other taxing units for penalty claims:

Debts owing to the United States or any State or subdivision thereof as a penalty or forfeiture shall not be allowed, except for the amount of the pecuniary loss sustained by the act, transaction, or proceeding out of which the penalty or forfeiture arose, with reasonable and actual costs occasioned, thereby and such interest as may have accrued thereon according to law. National Bankruptcy Act § 57j, 11 U.S.C. § 93(j).

A portion of the railroad reorganization section of the bankruptcy act seems to apply section 57(j) to railroad cases:

In proceedings under this section and consistent with the provisions thereof, the jurisdiction and powers of the court, the duties of the debtor and the rights and liabilities of creditors, and

of all persons with respect to the debtor and its property, shall be the same as if a voluntary petition for adjudication had been filed and a decree of adjudication had been entered on the day when the debtor's petition was filed.

In a case involving the lengthy reorganization of the New York, New Haven & Hartford Railroad, the Court of Appeals for the Second Circuit held that the tax liabilities of a railroad which were incurred prior to the consummation of the reorganization plan would be paid as a cost of administration. *See* In re New York, New Haven & Hartford R. Co., 147 F.2d 40, 52–53 (2d Cir. 1945). Another case holding that § 57(j) of the Bankruptcy Act applies to railroad reorganization proceedings is In re Denver & R. G. W. R. Co., 27 F.Supp. 983 (D.Colo. 1939).

There is no question that the taxes owed the municipalities and counties filing timely claims in this matter should be paid by the Trustee. As for interest, the Supreme Court held recently in Nicholas v. United States, 384 U.S. 678, 86 S.Ct. 1674, 16 L.Ed.2d 853 (1966), that interest should not be allowed in an ordinary bankruptcy proceeding in order to effectuate "the broad equitable principle that creditors should not be disadvantaged vis-a-vis one another by legal delays attributable solely to the time-consuming delays inherent in the administration of the bankruptcy laws." *Id.*, at 683, 86 S. Ct. 1674, 1679. The Court further held that the Trustee in bankruptcy would be liable for the penalties incurred through the non-payment of taxes when such penalties were imposed "solely because of the trustee's failure to file timely returns. * * *" *Id.*, at 695, 86 S.Ct. at 1685.

In the instant case, no penalties have been incurred through any failure of the Trustee to file timely returns. All taxes which have fallen due subsequent to the filing of the petition in reorganization on December 14, 1967, have been paid. The penalties are for delinquent taxes which accrued prior to this date.

Tennessee law grants these taxing units a "first lien" on the property of the Tennessee Central. It is stated in 5 Collier on Bankruptcy (14th ed.) ¶ 77.21 that: "Whenever tax claims are accorded a priority, even under 31 U.S.C. § 191, they will not supersede valid liens, or the priorities accorded administrative and operating costs or claims under the six months rule." Therefore, the municipalities and counties should not be granted a priority over the six months claimants unless they possess a valid lien for their tax claims. The Court is of the opinion that the applicable Tennessee statute grants such a lien to these taxing units. Earlier, in Collier, *id.*, it is noted: "With respect to state taxes, many state statutes grant a priority for claims thereon, and this priority will be recognized by the court." The statutory priority granted by § 67–1801, T.C.A., governs in this case. Therefore, these counties and municipalities will be granted first priority in this recovery, ahead of both the six-months claimants and the United States, as mortgagee and bondholder. No payment will be allowed as to the penalties which have been attached to these delinquent taxes, since the penalties have been in no way connected with any delay on the part of the Trustee. Interest on these taxes will be allowed only to the extent that it accrued prior to December 14, 1967. To allow the payment of any interest which accrued subsequent to this date would be unfair to the other creditors.

The Koppers Company has filed a claim in this action, claiming priority both under the six-months rule, and under Tenn. Code Ann. § 65–1021, which provides:

> No railroad company shall have power to give or create any mortgage or other kind of lien on its railway property in this state, which shall be valid and binding against judgments and decrees, and executions therefrom, for timbers furnished and work and labor done on, or for damages done to persons and property in the operation of its railroad in this state. T.C.A. § 65–1021.

Koppers sought recovery for approximately $120,000.00 worth of cross-ties furnished to the Tennessee Central.

Whether or not Koppers would be entitled to recover under the six-months rule, it seems clear that it is due a priority by virtue of the applicable Tennessee lien statute. There is no need for the Court to reach the question of recovery under the six-months rule, since Koppers will be allowed second priority in recovery against the corpus, following the taxing units, and preceding the six-months creditors.

While it is true that Koppers did not at any time perfect its statutory lien against the property of the Tennessee Central, the company states that the perfection of the lien was not carried out because of the injunction of this Court, holding all matters regarding the railroad's financial status in abeyance pending disposition of the reorganization proceeding. It is not necessary for Koppers to have formally perfected its lien against the Debtor. The intent of the Tennessee statute is clear, and Koppers and its claim fall within the ambit of the law.

The final claim which the Court must consider is that of the Humble Oil & Refining Company. Humble supplied the Tennessee Central with substantial amounts of diesel fuel during the six months preceding the filing of the reorganization petition and asserts a priority under the six-months rule. Humble contends in its brief that this fuel was "material necessary for the continued operation of the railroad."

It is not clear that the extension of credit from Humble was indispensable for the Tennessee Central to continue in operation during the six months prior to reorganization. For it is possible that some other fuel supplier might have extended this credit if Humble had refused to do so. Nevertheless, Humble's claim meets all of the criteria for application of the six-months rule as formulated in Guaranty Trust Co. v. Albia Coal Co., *supra*. Some fuel was certainly necessary to the continued operation of the

road, and Humble was willing to supply it. The position of Humble is analogous to that of the freight car leasing companies. If the Debtor had been deprived of either freight cars, or a supply of diesel fuel at the first sign of financial difficulties, it would have been shut down almost immediately.

The Court is of the opinion that Humble was, in this case, extending credit against current earnings within the contemplation of the six-months rule. Therefore, Humble is entitled to recover along with the other six months claimants.

This case represents a lengthy and unique exercise in railroad reorganization. As was discussed in this Court's opinion at 304 F.Supp. 789 (M.D.Tenn. 1969), the reorganization of the Tennessee Central was accomplished not through a restructuring of the existing corporate shell, but through the sale of virtually all of the Debtor's operating lines to other carriers, who have to this day continued service to all but a minute portion of the Tennessee Central's former area of service.

The Court's exercise of jurisdiction in this matter is basically a matter of equity. The six-months rule is itself a creature of equity. The Court must look to the equities of the individual situation in order to arrive at a decision. The primary consideration in the application of the six-months rule, in light of the declared purpose of the reorganization act to keep railroads in operation, is whether the creditor claiming a priority under the rule was a vital factor in the continued operation of the road.

In light of the expressed desire of Congress that railroads be kept in operation whenever possible, it must be assumed by the Court that it is more valuable to have the vast majority of the Tennessee Central trackage presently operated by other carriers, than to have the service discontinued altogether. The creditors who have kept the railroad in operation have thus benefitted the mortgagee and bondholder, the United States, by pre-

serving the service formerly provided by the Tennessee Central, thus enabling the trustee to sell the road as a going concern and to realize a greater return than would have been the case if he had been forced to sell the physical properties of the road after it had closed down.

A form of judgment will be submitted to accomplish these results.

## SUPPLEMENT TO OPINION OF AUGUST 19, 1970

While this case was under advisement, the United States Supreme Court decided the case of United States v. Key, 397 U.S. 322, 90 S.Ct. 1049, 25 L.Ed.2d 340 (1970). This case was not cited in any of the briefs before the Court, but was called to the attention of the Court by the attorney for the Trustee in the instant proceedings. Because the Court did not discuss the *Key* case in its opinion of August 19, 1970, this Supplement thereto is entered in the interest of completeness.

In United States v. Key, *supra*, the Supreme Court held that Stat. § 3466, 31 U.S.C.A. § 191, a provision giving a first priority to debts owed to the United States by an insolvent debtor, is applicable to tax claims of the Government in corporate reorganization proceedings under Chapter X of the National Bankruptcy Act, 11 U.S.C. §§ 501–676. In discussing the history of the reorganization provisions of the Act, Mr. Justice Marshall stated, in part:

> Section 77 [relating to railroad reorganizations] * * * was designed to follow the general format of the equity receivership. * * * However the problems of the equity receivership that led to the legislative intervention did not include the Government's priority under § 3466, a relatively uncontroversial aspect of the receivership procedure.
>
> Nothing in § 77 casts any doubt on the continued priority of the United States under § 3466. 397 U.S. at 330, 90 S.Ct. at 1054.

The opinion goes on to reason that the corporate reorganization provisions, later enacted by Congress and modeled closely after the railroad reorganization provisions, contain no provision indicating that Stat. § 3466 should not apply in Chapter X reorganizations.

It is the Court's opinion that the language in the *Key* case relating to the applicability of Stat. § 3466 to railroad reorganization proceedings is clearly dictum because the issue before the Supreme Court in *Key* was the applicability of Stat. § 3466 to Chapter X proceedings, and the reference to its applicability to railroad reorganizations was merely incidental to the decision on that one issue. Therefore, the *Key* case does not constitute precedent for allowing the Government's claim for a first priority in the assets of the Tennessee Central in the instant proceeding.