In the Matter of IOWA RAILROAD COMPANY, Debtor.

UNION PACIFIC RAILROAD COMPANY, et al., Plaintiffs–Appellees,

v.

Terry F. MORITZ, Trustee of Iowa Railroad Company, Defendant–Appellant.

Nos. 86–2760 & 87–1082.

United States Court of Appeals,
Seventh Circuit.

Argued June 3, 1987.

Decided Feb. 23, 1988.

Rehearing and Rehearing En Banc
Denied March 18, 1988.

Terry F. Moritz, Joanne M. Harmon, Goldberg, Kohn, Bell, Black, Rosenbloom & Moritz, Ltd., Chicago, Ill., for defendant-appellant.

James D. Benak, Omaha, Neb., for plaintiffs-appellees.

Before EASTERBROOK and RIPPLE, Circuit Judges, and GRANT, Senior District Judge.[*]

EASTERBROOK, Circuit Judge.

The Iowa Railroad endured from October 1981 to November 1984. During these years it conducted operations, largely with rented equipment, over 511 miles of other lines' track. Much of its business involved freight handled by two or more carriers. When the Iowa was the first carrier—for example, when picking up a shipment of grain that it would turn over to the Union Pacific for the haul to the west coast—it collected the charge for the entire movement. Other carriers would do the same for shipments they originated in which the Iowa was the terminating line. At the end of the month, the Iowa and its business partners sent each other vouchers showing the sums they had collected for transportation provided on other lines. Perhaps the Iowa would collect $50,000 on behalf of the Union Pacific, and the Union Pacific $10,000 on behalf of the Iowa. The carriers would set off these amounts, producing an "interline balance". If the difference ran in the Union Pacific's favor, that railroad sent the Iowa a bill. When the Iowa filed its petition in bankruptcy, it owed interline balances of about $4 million for shipments of freight, more than $1.4 million to the Union Pacific alone. We must decide

* The Honorable Robert A. Grant, of the Northern   District of Indiana, sitting by designation.

whether the railroad creditors have first claim to the Iowa's assets on the ground that interline balances are held in trust for other railroads. If the interline balances are trust funds, then the railroads will be paid in full and the Iowa's other creditors get next to nothing; if they are general unsecured debts, all creditors will receive about 64% of their claims.**

The district court held that the interline freight balances are trust funds, with corresponding priority. The court did not rely on any provision of the Bankruptcy Act or state law. It relied, instead, on *In re Penn Central Transportation Co.*, 486 F.2d 519, 531–33 (3d Cir.1973) (en banc) (Adams, J., concurring), in which Judge Adams—rejecting the majority's conclusion that interline balances are trust funds only to the extent state law so characterizes them—concluded that interline creditors are entitled to a preference because of "Congress' interest in creating and maintaining a viable interline rail system". *Id.* at 533. Judge Adams believed that a preference in bankruptcy is essential to ensure that railroads participate in a system in which carrier collects the entire cost of the movement; the abolition of this single-bill system, Judge Adams feared, "would greatly impede the smooth and efficient functioning of the through-route network." *Id.* at 532. The district court in this case added: "Principles of common sense and elemental justice require that the railroad which earned this money be declared to be its owner."

## I

We may dispose summarily of the argument from "common sense and elemental justice". The railroads that moved the freight are entitled to be paid—but so are the people who supplied it with diesel fuel, and its other creditors. All of these persons contributed essential ingredients of the movement of the freight and earned

their right to payment. That the interline creditors have been short changed by the Iowa does not imply that the other creditors should get nothing. Justice in a bankruptcy case is decision according to law. If the Iowa's general creditors have the same sort of property interest as the interline creditors, then justice requires courts to recognize both interests. As we said in *Boston & Maine Corp. v. Chicago Pacific Corp.*, 785 F.2d 562, 566 (7th Cir.1986), another case involving interline balances:

> [The district court thought] that considerations of equity overrode the law. But equity in law *is* the consistent application of legal rules. The definition of *in*equity is unequal application of norms. *Federated Department Stores v. Moitie*, 452 U.S. 394, 401 [101 S.Ct. 2424, 2429, 69 L.Ed.2d 103] (1981). The bankruptcy law treats all pre-bankruptcy claims of the same class equally. When one claimant gets treatment that is denied to others, they have been treated inequitably.

See also, e.g., *Bonded Financial Services, Inc. v. European American Bank*, 838 F.2d 890, 893 (7th Cir.1988); *In re Chicago, Milwaukee, St. Paul & Pacific R.R.*, 791 F.2d 524, 528 (7th Cir.1986); *Guerin v. Weil, Gotshal & Manges*, 205 F.2d 302, 304 (2d Cir.1953) (A. Hand, J.). The decision in this case turns on property rights, not notions of equity.

## II

Unless a specific provision of the Bankruptcy Code requires a different result, the function of bankruptcy law is to marshal the debtor's assets and distribute them according to the property rights of the creditors. (We put to one side managerial tasks such as maintaining the firm during a reorganization.) These property rights are defined in most cases by state law. When they are so defined, the bankruptcy court

---

** The Iowa has assets of about $4.4 million in cash and receivables, plus some machinery. The interline creditors lay claim to $4.06 million; the Iowa's trustee concedes the validity of these claims but disputes their priority. Other creditors claim $1.9 million; these, too, are largely undisputed. A suit pending against the

Iowa has an ad damnum of $7.2 million; and if these plaintiffs prevail in full, the railroad's debts would exceed $13 million, with correspondingly smaller payoffs for all creditors in the event the interline balances are general unsecured debt.

must implement rather than alter them. *Butner v. United States,* 440 U.S. 48, 54–57, 99 S.Ct. 914, 917–19, 59 L.Ed.2d 136 (1979); *In re American Reserve Corp.,* 840 F.2d 487 (7th Cir.1988); *Boston & Maine,* 785 F.2d at 565–66. We said in *Boston & Maine* that interline creditors do not get special treatment. It remains to be seen, however, just what the ordinary treatment may be. State law is the principal but not the only source of property rights; federal law, too, may supply these rights, and the pervasive federal regulation of the rail business requires us to scrutinize federal law with some care. The survey is animated, however, by the principle that we are looking for legal entitlements rather than for the arrangements that seem to us best.

We start with the question whether the Bankruptcy Code settles the subject. The trustee says that it does, in his favor. Since the trustee believes that the 1978 Code disposes of the subject by *not* discussing it, the appreciation of the argument requires a bit of background.

Railroads have been turning belly up with great frequency ever since Stephenson's "Rocket". Interline operations have been common since the founding of American roads, so the treatment of interline balances also is an old subject. See *Miltenberger v. Logansport Ry.,* 106 U.S. (16 Otto) 286, 293, 1 S.Ct. 140, 146, 27 L.Ed. 117 (1882). Until 1933, when Congress added § 77 to the old Code, 11 U.S.C. § 205 (1976), all railroad bankruptcies were handled as equity receiverships; under § 77 the ICC acquired a principal role in reorganizations but the principles of the common law continued to govern most relations among creditors. The rules for equity receiverships permitted courts to enhance the priority of debts incurred as operating expenses within the six months prior to insolvency or necessary to the continued operation of the debtor. See *Miltenberger,* 106 U.S. at 311, 1 S.Ct. at 162. Courts applied these principles, without extended discussion, to interline balances. E.g., *Gregg v. Metropolitan Trust Co.,* 197 U.S. 183, 25 S.Ct. 415, 49 L.Ed. 717 (1905); *Southern Ry. v. Flournoy,* 301 F.2d 847, 850–53 (4th Cir.1962); *Southern Ry. v. United States,* 306 F.2d 119 (5th Cir.1962); *In re Tennessee Central Ry.,* 316 F.Supp. 1103, 1110–12 (M.D.Tenn.1970), vacated on other grounds, 463 F.2d 73 (6th Cir.1972). This approach assumed that interline balances are general, unsecured debts. Not until 1967 did any interline creditor argue that the balances are "trust funds" or otherwise entitled to priority exceeding that available to other operating expenses. *In re Central Railroad Co. of New Jersey,* 273 F.Supp. 282, 288 (D.N.J.1967), affirmed by adoption, 392 F.2d 589 (3d Cir.1968), brusquely replied: "That they are not trust funds is clear. The relationship among the several carriers engaged in an interline freight movement is that of debtor and creditor."

The Third Circuit took a different path in its en banc decision of 1972. It distinguished among kinds of interline balances. Those for freight and passenger transportation, it concluded, are collected by one carrier and held in trust for others. 486 F.2d at 523–27. (We discuss in Part V the court's grounds for this conclusion.) Other interline balances—per diem car charges (rental of one line's cars being used by another pending their return), switching charges, and several other categories—the court thought were general unsecured debts, largely because the debtor did not collect a specific charge from customers for these balances and so did not generate a fund. *Id.* at 527–29. The trust funds for pre-bankruptcy balances must be turned over immediately, the court held, regardless of the claims·of competing creditors. The other balances, however, could be retained pending final reckoning. In 1976 we took still a different approach, holding that ICC rules required the immediate payment in full of pre-bankruptcy interline per diem balances, whether or not they were trust funds. *In re Chicago, Rock Island & Pacific R.R.,* 537 F.2d 906 (7th Cir.1976). Interline freight and passenger balances were current operating expenditures to be paid as they arose. Other pre-bankruptcy balances would be treated as unsecured debt. The Third Circuit promptly rejected this holding, reiterating its position that

per diem car charge balances are general, unsecured debts. *In re Penn Central Transportation Co.*, 553 F.2d 12 (3d Cir. 1977).

When Congress overhauled bankruptcy law in 1978, then, the Third Circuit treated passenger and freight balances (but no others) as trust funds; this court treated passenger and freight balances as current operating expenses and per diem accounts as trust funds; other courts had been silent since 1963. The rules in force in the Third and Seventh Circuits had two effects: priority for certain debts, and immediate payout (rather than payment with other secured creditors at the end of the case).

Lobbyists for solvent (creditor) railroads tried to consolidate and extend these gains. The House passed a bankruptcy bill first, including nothing on the subject. The principal bill pending in the Senate, S. 2266, 95th Cong., 1st Sess. (1977), contained a provision (§ 1169) authorizing a railroad's trustee to pay in full all pre-bankruptcy interline balances without waiting for a court to approve the payment. Witnesses for creditor railroads objected to this on the ground that it did not *require* the trustee to pay these claims. *Hearings on* S. 2266 and H.R. 8200 Before the Subcommittee on Improvements in Judicial Machinery of the Senate Committee on the Judiciary, *95th Cong., 1st Sess. 759–71 (1977) (testimony on behalf of the Association of American Railroads and the Union Pacific Railroad). The Committee then reported, and the Senate passed, a bill providing:*

> [T]he debtors under this chapter *shall pay in cash* pursuant to statutory, [ICC], or recognized rail industry settlement procedures, or Commission orders of general applicability, the current net balances owed by the debtor to other carriers on its interline freight, passenger and per diem ... accounts for the periods both prior and subsequent to the date of filing of the petition without the necessity of court approval.

Section 1168(1) of S. 2266, as passed (emphasis added).

The House did not accept this part of the Senate's bill, and the Senate capitulated.

The Code as enacted does not so much as mention interline balances. See 11 U.S.C. § 1166, the provision into which § 1168 of the Senate bill evolved. The managers from each side remarked: "[T]he proposal contained in Section 1168(1) of the Senate bill is rejected as violative of the principle [of] equal treatment of all creditors under title 11." 124 Cong.Rec. 34008 (Oct. 5, 1978) (Sen. DiConcini), *32409* (Sept. 28, 1978) (Rep. Edwards). (The bill lacks a conference report, but its managers in each chamber read identical explanatory statements into the Congressional Record.)

The failure of the industry's lobbyists was among the considerations that led the First Circuit in *In re Boston & Maine Corp.*, 600 F.2d 307, 313 (1st Cir.1979), to reject *Chicago, Rock Island* and conclude that interline per diem car balances should be treated as general, unsecured debt. We then concluded in *Boston & Maine v. Chicago Pacific*, 785 F.2d at 567, that *Chicago, Rock Island* had been effectively overturned. Our *Boston & Maine* decision held that pre- and post-bankruptcy interline balances are not "mutual" debts and may not be offset. The Iowa's trustee argues that the events of 1978 also dispose of the Third Circuit's holding that interline freight and passenger balances are trust funds.

Doubtless the excision of language from a pending bill may be highly informative. E.g., *Carey v. Donahue*, 240 U.S. 430, 36 S.Ct. 386, 60 L.Ed. 726 (1916). We cannot give the bill, as enacted, a meaning that was confronted and deleted. So if the interline creditors try to rely on the 1978 Code they must lose. But they do not rely on the Code; they rely on ICC rules and state law that predates the Code. The excision in 1978 reflects only disagreement between House and Senate. The trustee believes that this disagreement—which blocked the enactment of *any* legislation on the subject—changed existing rules. An unsuccessful attempt to change the law does not by itself change the law in the other direction. E.g., *FTC v. Dean Foods Co.*, 384 U.S. 597, 608–12, 86 S.Ct. 1738, 1744–47, 16 L.Ed.2d 802 (1966); *Wong*

*Yang Sung v. McGrath,* 339 U.S. 33, 47, 70 S.Ct. 445, 452, 94 L.Ed. 616 (1950).

Congress must act by agreement of both chambers, see *INS v. Chadha,* 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983). If the refusal of one chamber to accede to the other's proposal were enough to change the law, we would have unicameral action, the same problem that doomed the legislative veto. The most one can say is that a stalemate in 1978 compelled Congress to avoid the subject of this case. Whatever the law was then, it still is. If interline freight balances are "trust funds" under governing law, then giving creditor railroads the status of trust beneficiaries does not violate any principle of equal treatment; the absolute priority rule requires trust beneficiaries to be paid first. If interline creditors do not have interests in trust funds, then giving them a preference would violate the rule that creditors of the same class be treated equally. So the question remains: what type of property interest do interline creditors have?

### III

The interline creditors have three possible sources of property rights: federal statutory law, federal interests sufficiently strong to demand the creation of federal common law, and state law. *Butner* holds, and our opinion in *Boston & Maine* reiterates, that state law is the usual source of creditors' rights in bankruptcy cases—exactly as the majority in *Penn Central* held. The district court followed Judge Adams' concurring opinion, however, and so did *In re Ann Arbor R.R.,* 623 F.2d 480 (6th Cir.1980), concluding that the federal interest in a unified national rail system requires interline balances to be treated as trust funds. We therefore take up federal law first—statute law in Part III, common law in Part IV—before turning to state law in Part V.

The Interstate Commerce Act does not mention interline balances. It is, indeed, mostly silent on relations among carriers. They need not offer interline services or through rates—although the ICC may order the establishment of through routes, 49 U.S.C. § 10705(a)(1). If a carrier proposes to back out it must show that the cessation is appropriate, and the ICC may suspend the withdrawal and investigate the discontinuation. 49 U.S.C. § 10705(e); *Chesapeake & Ohio Ry. v. United States,* 704 F.2d 373 (7th Cir.1983).

The ICC has the power to make regulations affecting the question, and these regulations may have the force of law. It has promulgated regulations concerning per diem car charges. Each railroad must accept others' cars, which it must pay for at fixed rates until returning them. *Ex Parte No. 334, Car Service Compensation,* 362 I.C.C. 884 (1980), invoking authority under 49 U.S.C. § 11122. It has not exercised regulatory power, however, with respect to freight or passenger interline balances.

The ICC also has the power to require a uniform system of accounts, see 49 U.S.C. § 11142. Uniform accounting promotes comparative judgments in ratemaking, cf. *ICC v. Goodrich Transit Co.,* 224 U.S. 194, 32 S.Ct. 436, 56 L.Ed. 729 (1912), and the ICC extensively regulates how (some) railroads account for interline balances. 49 C.F.R. §§ 1200–1201. These rules could be a source of property interests in the treatment of interline balances, and we asked for supplemental briefs on this subject.

It turns out that the qualification "some" is important, for the ICC's accounting rules apply only to Class I railroads, lines with revenues exceeding $50 million per year. 49 C.F.R. § 1201(A)(1–1)(a), (c). The Iowa was a Class III railroad (revenues less than $5 million annually) and therefore not governed by the rules; whatever rights they establish among Class I railroads do not apply to the Iowa. Moreover, the accounting rules assist the Iowa's trustee to the extent they apply. The ICC requires railroads to account for interline balances due as "accounts receivable", and for interline balances payable as "accounts payable". 49 C.F.R. § 1201, Rules 705 and 752. The accounting rules do not hint that these funds must be segregated and accounted for as trust monies. We conclude, therefore, that federal statutes and regulations do not support the interline creditors.

## IV

The old National Transportation Policy, 49 U.S.C. preceding § 1 (1976), proclaimed a federal objective of "developing, coordinating, and preserving a national transportation system". Judge Adams wrote against this background. See 486 F.2d at 531 & n. 2, 533 (relying on the National Transportation Policy). The Staggers Rail Act of 1980 ended the application of this policy to railroads. The new Rail Transportation Policy, 49 U.S.C. § 10101a, speaks of permitting competition "to the maximum extent possible" (§ 10101a(1)) and "minimiz[ing] the need for Federal regulatory control over the rail transportation system" (§ 10101a(2)). It does not mention promoting a unified national rail system. See *ICC v. Texas*, — U.S. —, 107 S.Ct. 787, 793, 93 L.Ed.2d 809 (1987).

We may assume, however, that shippers' ability conveniently to send freight over a network of connected railroads is an important federal objective, making some cooperation among railroads essential. Dennis W. Carlton & J. Mark Klamer, *The Need For Coordination Among Firms, With Special Reference to Network Industries*, 50 U.Chi.L.Rev. 446 (1983). We also assume, with Judge Adams, that convenience includes the ability to pay a single carrier for the entire movement. Judge Adams believed that treating interline carriers as unsecured creditors would lead each to insist on separate payment, ending the convenient payment system now in use. We part company with him at this step—both because it is not the sort of interest that permits the creation of federal common law and because it is not supported.

A. To say that there is a federal common law governing interests in funds received by rail carriers is to say that state law is preempted. Until *Butner* many courts believed that bankruptcy permitted federal courts to override state rules when that would be desirable in light of some other objective. *Butner* disapproved of that approach, holding that property rights under state law govern unless there is a contrary federal rule.

A federal rule must be grounded in a concrete federal interest with which the application of state law would interfere. That the dispute involves the interstate transportation network is not enough. See *Miree v. DeKalb County*, 433 U.S. 25, 97 S.Ct. 2490, 53 L.Ed.2d 557 (1977), rejecting the argument that the flow of commercial aviation justifies a national rule concerning airports' responsibility to make it safe for planes to take off. Even when the United States is a party, and multi-state transactions are involved, courts must ordinarily find in state law the rules of decision. *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 727–29, 99 S.Ct. 1448, 1457–59, 59 L.Ed.2d 711 (1979).

Private parties stand on both sides of this transaction. Congress has not occupied the field in question. So only a demonstration of substantial conflict between state law and the achievement of an objective defined by federal law would support a conclusion that federal law controls. Extensive regulation is no substitute for a conflict. E.g., *Louisiana Public Service Comm'n v. FCC*, 476 U.S. 355, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986); *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984). And it is hard to identify a conflict between state and federal policies even if failure to treat interline balances as trust funds should lead railroads to bill customers separately. This is at most a question of convenience. Small conveniences add up, no doubt, and shippers prefer the current system, but the inconvenience of separate invoicing would not strike at the life blood of interstate commerce.

B. The heart of Judge Adams' position, which the district court adopted, is the belief that treating interline railroads as unsecured creditors would compel them to deny to customers the convenience of unitary billing. Both Judge Adams and the district judge viewed this as so obvious that argument was unnecessary. We do not find it obvious at all.

Railroads need security, not complete assurance. The system of interline *balances* assures payment of most debts automati-

cally: the Iowa "pays" the Union Pacific by providing transportation services when the Union Pacific is the originating carrier. Only the nets become debts. The risk railroads take is a correspondingly small portion of their revenues.

Railroads have ways to deal with the risk of default by collecting carriers on the balances remaining after the automatic set-offs. One is to scrutinize the creditworthiness of their trading partners, just as firms ordinarily do. Sellers of carpets to department stores are treated as unsecured creditors in department-store bankruptcies, but this has not led to the end of trade credit. Sound railroads will do business as usual. Collecting carriers with shaky finances may be required to post bonds, secure letters of credit, or find other ways to assure that they turn over receipts to the railroads that provide part of the transportation. The economy teems with such devices. Standby letters of credit assure payment for billions of dollars of transactions daily. Factors provide the financing for many a thinly capitalized firm. To protect their investments, factors commonly receive incoming sums and apportion them properly. It is easy to imagine the equivalent of a factor in the railroad business receiving the remittances on the Iowa's invoices, then sending the Union Pacific its due and holding the rest for the Iowa's account. Other railroads also could put the Iowa on a cash basis, receiving payment in advance for a fixed quantity of transportation services (which would let the Iowa keep the collection for the entire movement), or could take security interests in the Iowa's cash and receivables. And, of course, they could do what they largely have done: require other railroads to remit exceptionally quickly, holding to a minimum the exposure at any moment. (More on this below.) These devices work reasonably well. Railroads have employed the one-charge system on interline shipments for at least 100 years, even though until 1973 no court had held that interline balances are trust funds.

We can learn something from the experience of other industries, too. The airline business, the trucking business, the telecommunications business, and several others use interline transfers. A traveler may buy from United Airlines a ticket covering a movement on multiple carriers. A single charge covers a phone call that may start on Ameritech's lines, move over MCI's interstate trunks, and end on Nynex's lines. The carriers apportion among themselves the payments for the joint service. Yet in none of these businesses are the sums paid to the originating carrier treated as trust funds for the subsequent carriers.

Take the airline business. Although no statute requires this, most carriers have interline agreements with others whose routes make interchanges feasible—either individual contracts or through the Airline Clearing House, Inc., an association formed for this purpose. Airlines do this even though bankruptcy has become common (Continental, Braniff, and Frontier are prominent examples). They do so even though the sums one airline has collected for transportation rendered by another are treated as unsecured debts. See *In re Braniff Airways, Inc.*, No. 482–00369 (Bkr. N.D.Tex. Feb. 1, 1983). The problems in collecting from a bankrupt airline pale beside the problems in collecting from bankrupt travel agents. Agents receive billions of dollars from travelers for services furnished by airlines; they stand to all airlines much as the Iowa stands to the Union Pacific. *In re Morales Travel Agency*, 667 F.2d 1069 (1st Cir.1981), holds that the claims of the airlines are unsecured debts of travel agencies. Yet airlines go on dealing with travel agents, and travelers reap the benefits of convenience. See also, e.g., *In re Shulman Transport Enterprises*, 33 B.R. 383 (S.D.N.Y.1983), affirmed, 744 F.2d 293 (2d Cir.1984), holding that the relation between air freight forwarding services and the airlines supplying the transportation is that of debtor-creditor.

The motor carrier business looks much the same. Motor carriers may enter into joint and through route agreements, 49 U.S.C. § 10703, and the ICC may prescribe them when appropriate. The originating or destination carrier collects the price of the entire movement and remits the divisions to other carriers. Courts treat sums owing

to other carriers as unsecured debts. E.g., *In re Penn–Dixie Steel Corp.*, 10 B.R. 878 (S.D.N.Y.1981); *Allied Van Lines, Inc. v. SBA*, 507 F.Supp. 397 (E.D.Mo.1980), affirmed, 667 F.2d 751 (8th Cir.1982). The lack of trust status—and the fact that motor carriers face bankruptcy risks at least as great as travel agents, airlines, and railroads—has not prevented motor carriers from offering customers the convenience of a single bill per shipment.

The parties have not called to our attention any business other than railroads in which even one court has treated interline balances as trust funds. They also have not called to our attention, and we could not find, an industry in which the treatment of interline balances as unsecured debts has led to inconvenience to customers. Cf. *CFTC v. Heritage Capital Advisory Services, Inc.*, 823 F.2d 171 (7th Cir. 1987) (money deposited with a broker for transfer to a manager is not held in trust for the customer). This should not be a great surprise. If customers value the convenience of paying by a single bill, firms will strive to supply their desires. Those that figure out how to do so at least cost will flourish.

This may seem to overlook the cost. If the railroad business swallows losses in order to provide convenient billing, the customer pays in the end. Perhaps one could argue that the financial health of the railroad business depends on being able to collect interline balances quickly. This is not a complete view, however. Railroads are on both sides of these transactions. If some railroad is more secure, another is less so. If interline creditors always get 100¢ on the dollar, then other creditors (suppliers of fuel, equipment, and labor first among them) get less. They perceive the risks as greater and must do more to protect themselves—take security interests, charge higher interest, and so on. Shippers must pay these alternative costs, too. In other words, the risk of failure is part of the business. If railroads insulate some of their creditors (interline roads) from the risk, they expose other creditors to more of it; in the end, someone bears the whole risk, and shippers pay the full cost. There is no panacea in making interline creditors

better off. We therefore do not agree with Judge Adams that giving interline creditors priority claims on the funds of bankrupt railroads is essential to the preservation of a national transportation system. Perhaps it would help; we express no view on the long run merit of the system. It is not so *clearly* important that a federal court may create federal common law to trump the state law that governs competing claims to a debtor's funds.

## V

The opinion of the court in *Penn Central* held that interline freight balances between Class I railroads are held in trust under state law. The railroad creditors in this case rely on that holding. The Third Circuit did not say *which* state's law; neither do the railroad creditors here. The railroads apparently are content to rely on a "general common law"—as if Justice Holmes had never observed that there is no

> transcendental body of law outside of any particular State but obligatory within it unless and until changed.... Law is a word used with different meanings, but law in the sense in which courts speak of it today does not exist without some definite authority behind it. The common law so far as it is enforced in a State, whether called common law or not, is not the common law generally but the law of that State existing by the authority of that State without regard to what it may have been in England or anywhere else.

*Black and White Taxicab & Transfer Co. v. Brown and Yellow Taxicab & Transfer Co.*, 276 U.S. 518, 533–34, 48 S.Ct. 404, 409, 72 L.Ed. 681 (1928) (Holmes, J., dissenting), overruled by *Erie R.R. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). See also *Guaranty Trust Co. v. York*, 326 U.S. 99, 101–03, 65 S.Ct. 1464, 1465–67, 89 L.Ed. 2079 (1945). The law applicable to this case under the conflicts rules of Illinois, in which the federal court sits, may be different from the trust law of Pennsylvania. The parties are free to agree on sub-

stantive law within limits, however, and have treated this as a subject on which state laws do not differ. The federal courts refer to the "whole law" of the forum state, *Klaxon v. Stentor*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). When (as here) the parties do not say that the forum state's conflict-of-laws rules require the application of another state's substantive law, this means we must apply the forum state's substantive law. *Casio, Inc. v. S.M. & R. Co.*, 755 F.2d 528, 531 (7th Cir.1985). The parties have done little to enlighten us about Illinois law, however, turning instead as the Third Circuit did to the *Restatement (Second) of Trusts* (1957).

Railroads use two principal methods to settle interline balances. Under the bill-and-voucher method, which the Iowa used for most of its existence, the destination carrier computes the portions of the total charge each railroad involved in the movement is entitled to receive. (The originating carrier may collect the shipping charges from the shipper, or the destination carrier from the consignee; in either case, the destination carrier computes the divisions of revenue, because the final waybill shows the complete movement, which could change en route.) The destination carrier sends statements of entitlements called "abstracts" to all other railroads involved by the 18th of the month after the waybills were issued. The railroads send each other monthly statements of sums received for movements performed by others, by the 20th of the month (that is, almost immediately after receiving the abstracts). Railroads offset these statements, and the creditor railroad sends a bill for the balance. The debtor railroad pays this bill as it does others. It does not maintain segregated accounts. The Iowa remitted 60 or more days after receiving its bills, without protest by the creditor railroads.

The 28 Class I railroads use a different method, prescribed by the Association of American Railroads. Eighty or so Class II and III railroads participate in this system voluntarily (while about 420 small railroads use the bill-and-voucher system). After the circulation of the abstracts by the 18th of the month and the statements of net balances by the 20th, the nets are subject to immediate collection. Each railroad participating in the AAR's system has a microencoded plastic card for each of the others. The creditor line uses the card to prepare a sight draft against the debtor's bank account. The creditor road puts this draft into the bank settlement system just as if it were a check signed by the debtor railroad. The debtor's bank pays in the ordinary course. The balance thus is paid instantly without any action by the debtor line. At the time of the *Penn Central* case, the Class I railroads used a system of sight drafts minus the microencoded cards; then, as now, the creditor line took charge of obtaining payment from the debtor's banks.

*Penn Central* dealt with the payment of balances for May 1970, the month before that railroad entered bankruptcy. The petition was filed on June 21, 1970, just as sight drafts for May were being received. The Penn Central's banks dishonored drafts for about $15 million received on or after June 22, and the creditor railroads asked the bankruptcy court to order payment. Relying on the *Restatement*, the Third Circuit concluded that the Penn Central held this $15 million in trust for the other railroads and ordered immediate payment.

It recognized that under § 2 of the *Restatement* —and so far as we know the law of all 50 states—a trust is a contractual arrangement and therefore depends on the parties' agreement. See *La Throp v. Bell Federal Savings & Loan Ass'n*, 68 Ill.2d 375, 12 Ill.Dec. 565, 370 N.E.2d 188 (1977). The railroads have not expressly declared interline balances to be trust funds, and they do not use some of the customary indicia of trusts, such as segregated accounts. The Iowa regularly invested its collections and kept the proceeds, remitting only the principal to the interline carriers. And the shippers, potential settlors of such trusts, not only have no pertinent intent but also do not know how the railroads handle the funds (or much care, so long as

the goods are delivered). There is no express trust.

*Penn Central* concluded that agreement may be implied as well as express. The AAR's system of prompt settlement and immediate payment amounted to an implied trust agreement, the court held. The AAR's settlement system treats each railroad as a collecting agent for the others. The funds may be commingled by the collecting railroad, but they are at the disposal of the creditor railroad with the power to write sight drafts. *Penn Central* thought it significant that the funds were payable without interest, 486 F.2d at 524, and insignificant that they could be commingled, *id.* at 525. The magnitude of the daily collections, and the number of interline roads (the Penn Central dealt with more than 300), made segregation of accounts impractical, the court thought.

We are sympathetic to the contention that the AAR's accounting rules, coupled with the system of sight drafts that give creditor lines effective dominion over the funds, is the practical equivalent of a declaration of trust. The trouble from the interline creditors' perspective is that the Iowa did not participate in the AAR's system for more than a few months. During the period at issue in this case it used the bill-and-voucher system, under which interline railroads had no more control over payment than did the Iowa's suppliers of diesel fuel. *Penn Central* expressly distinguished such a case. *Southern Ry. v. United States*, 306 F.2d 119, 124–25 (5th Cir.1962), declined to accord priority treatment to interline claims by the Southern against the Tallulah Falls Ry. when Southern submitted a bill and waited for more than a year to be paid, without demanding the segregation of funds. The Third Circuit viewed this decision as consistent with its own (486 F.2d 525–26); it was apparently cases like *Southern* that led Judge Adams to urge the creation of federal common law to protect interline creditors who fail to protect themselves.

The Iowa's case is much closer to *Southern* than to *Penn Central*. The Iowa did not allow other railroads to write sight drafts against its accounts. It declined to pay interline balances until presented with both an abstract of waybills and an invoice; when billed, it paid slowly (60–90 day delays were common). The other lines did not respond by insisting that the Iowa segregate its collections for their benefit; so far as the record shows, they did not even protest the slow payment. When the Iowa failed, it had at least six months of interline balances outstanding. It is difficult to resist the impression that the Iowa treated other railroads as trade creditors, and that they acquiesced in this treatment. This is the opposite of a manifest intent to create a trust, and without such an intent there is no trust. *Restatement* § 24 comment *c:* "It is essential to the creation of a trust that the settlor should manifest by some external expression his final and definitive intention that a trust should arise." The "external expression" is important to other creditors, who need objective signs in order to determine their own priority to the assets ostensibly held by their trading partners.

Although the Iowa did not hold the receipts in an express trust, perhaps it held them as a resulting trust. Under *Restatement* § 440, "[w]here a transfer of property is made to one person and the purchase price is paid by another, a resulting trust arises in favor of the person by whom the purchase price is paid". See *In re Wilson*, 81 Ill.2d 349, 43 Ill.Dec. 23, 410 N.E.2d 23 (1980). The paradigm is the sale of a cow from A to B, with B paying but C temporarily in possession. C holds the cow in trust for B. Or A sells stock to B, which places the certificates with C to be held in street name; C is trustee for B. *Restatement* § 440 Illustration 1. Perhaps one could say that the Union Pacific transferred "services" to the Iowa, which collected the price; but on this reading the Iowa holds the transportation services in trust for shippers. The parties have not called to our attention, and we have not found, any case treating as a "resulting trust" the money received from a customer when the seller was blending goods or services of several suppliers and selling them as a unit. "A resulting trust . . . seeks to carry

out a donative intention rather than to thwart a wicked scheme." *American National Bank & Trust Co. v. United States,* 832 F.2d 1032, 1035 (7th Cir.1987) (Illinois law). No one argues that the shippers or consignees—the settlors in a resulting-trust approach—had any particular intent about how the Iowa would apportion the shipping charges. They cared only that they receive the transportation they paid for, as they did. Since in Illinois the "burden of proof is upon the party seeking to establish a resulting trust and the evidence must be clear, convincing and unmistakable", *Wilson,* 43 Ill.Dec. at 47, 410 N.E.2d at 27, this approach does not yield the railroads much mileage. The air and truck transportation cases we discussed above, those closest in principle to the railroad case, all reject the argument that the collecting airline, trucker, or travel agent holds the funds in trust for the carriers providing the service.

The last possibility we need consider is the "constructive trust" under the *Restatement of Restitution* § 160 (1937), providing that a trust arises "[w]here a person holding title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it." The interline railroads mention but do not seriously pursue this possibility. A constructive trust usually depends on a fraudulent act to obtain control of the assets, see *In re General Coffee Corp.,* 828 F.2d 699 (11th Cir.1987) (Florida law); *Fender v. Yagemann,* 29 Ill.2d 205, 210, 193 N.E.2d 794 (1963); and the Iowa put its hands on this money legitimately. There could be a decent claim of unjust enrichment if we had to decide whether the Iowa's stockholders or the interline railroads should get the money remaining in the Iowa's coffers; it would unjustly enrich the stockholders to receive this money. But that is not the problem. The question is whether the interline railroads get all of the money and the suppliers of diesel fuel (and tort creditors) none; or whether all creditors share the inadequate funds. The suppliers of diesel fuel will not be "unjustly enriched" if they receive 70% of their debts (without

interest). All of the Iowa's creditors have supplied valuable goods and services; all have been stiffed. No case of which we are aware employs the idea of the "constructive trust" to settle priorities among bona fide business suppliers. Several have rejected this approach. E.g., *In re North American Coin & Currency, Ltd.,* 767 F.2d 1573 (9th Cir.1985); *In re First Capital Mortgage Loan Corp.,* 60 B.R. 915 (Bkr.D.Utah 1986). The sellers of diesel fuel might as well argue that a constructive trust runs in *their* favor. What we have is a breach of contracts, which is not enough to create a constructive trust, *id.* at § 108.

The Iowa did not expressly declare that it held funds in trust; it did not segregate its funds; it did not accede to the AAR's system of sight drafts that would put funds at the disposal of the interline railroads; these railroads did not protest the Iowa's glacial payment. Nothing in the way the Iowa did business would have alerted other creditors that the funds ostensibly in its control were held in trust. We therefore conclude that the interline balances are general, unsecured debts of the Iowa.

REVERSED AND REMANDED

RIPPLE, Circuit Judge, concurring.

I join the judgment and the opinion of the court. I write separately to emphasize that, as the court notes explicitly in the last several sentences of Part IV, our holding is based on the policy choices Congress has made with respect to national transportation policy. Our views as to whether this policy is an appropriate one are irrelevant to a resolution of the legal question before us.