**MISSOURI PACIFIC RAILROAD COMPANY; and Union Pacific Railroad Company, Plaintiffs–Appellees,**

v.

**ESCANABA AND LAKE SUPERIOR RAILROAD COMPANY, Defendant–Appellant.**

No. 89–1749.

United States Court of Appeals, Sixth Circuit.

Argued Jan. 29, 1990.

Decided Feb. 26, 1990.

William E. Rohn, Richard A. Kay, Mark S. Allard, Varnum, Riddering, Schmidt & Howlett, Grand Rapids, Mich., James D. Benak, Gen. Atty. (argued), Missouri Pacific R. Co., Omaha, Neb., for plaintiffs-appellees.

Robert L. Bach (argued), Saint Paul, Minn., for defendant-appellant.

Before MILBURN and NORRIS, Circuit Judges; and CONTIE, Senior Circuit Judge.

MILBURN, Circuit Judge.

This appeal presents the question of whether a smaller, Class III railroad holds "interline freight revenue" for larger, Class I railroads in trust, or as an unsecured business debt. We have held that interline freight revenue is held in trust, *see Chase v. Committee of Interline R.Rs. (In re Ann Arbor R.R. Co.)*, 623 F.2d 480, 483 (6th Cir.1980), but in rendering that decision, we did not consider the *size* of the railroads involved. In this case, defendant-appellant Escanaba and Lake Superior Railroad Company ("E & LS"), a Class III railroad, arguing that the *size* of the railroads involved is a distinguishing and/or determining factor, appeals the summary judgment granted by the district court that it held interline freight revenues in trust for the plaintiffs-appellees, Missouri Pacific Railroad Company and Union Pacific Railroad Company, Class I railroads. For the reasons that follow, we affirm.

## I.

### A.

Interline freight revenue is generated in the interline freight network, in which the nation's many railroad lines function as a single system. The network allows shippers to make one payment to ship freight across the country, even though the load may travel on several railroad lines over the course of its journey.

In an interline shipment, the shipper pays the shipping fee either to the railroad to whom he delivers the load (the "origin carrier") or the railroad that will deliver the load to its final destination (the "destination carrier"). Regardless of which carrier receives payment, the origin carrier generates a bill of lading and a waybill for the shipment. The bill of lading is a title document, while the waybill describes the freight, its route, and the carriers involved in its shipment. The waybill accompanies the freight throughout the shipment and into the hands of the destination carrier.

All railroads, regardless of their size, can and do serve as origin and destination carriers for various shipments. Every month, each railroad prepares "waybill abstracts" for the shipments on which it served as the destination carrier. The abstracts list the portion of the shipment fee that is due each railroad that participated in each particular shipment. The railroads distribute the abstracts to each other by the eighteenth of each month and use them to calculate their interline balances—how much they owe other railroads, and how much they are owed.

The Interstate Commerce Commission classifies railroads by size and requires certain classes to follow certain interline balance accounting practices. *See* 49 C.F.R. § 1201(1–1) (1988). Railroads with annual operating revenues of $50 million or more are classified as Class I railroads, while railroads with annual operating revenues of $10 million or less are Class III railroads. The regulations require Class I railroads to treat interline revenues owing from other railroads as accounts receivable, and interline revenue owed to other railroads as accounts payable. *See* 49 C.F.R. 1201, Rules 705, 752. The regulations impose no similar accounting requirements upon Class III railroads. In addition, the ICC regulations do not mention whether interline balances are, or should be considered to be, held in trust or as unsecured business debts by any railroad.

Railroads generally use one of two methods to pay their interline debts. Members of the American Association of Railroads ("AAR"), and nonmembers who choose to, use the "sight draft" method, while other railroads use the "bill and voucher" method. Under the sight draft method, the railroads pay any net interline fees they owe immediately upon receipt of the waybill abstracts. Immediate payment is made through the use of microencoded cards that allow railroads to draw sight drafts against other railroads' bank accounts. The plaintiffs are AAR members and use this method when possible.

Defendant E & LS is not an AAR member, and like many other railroads, it uses bills and vouchers. Under this method, railroads send monthly bills based upon waybill abstracts. Railroads are expected to make payment immediately upon receipt of the bills.

Under either method of payment, interline freight debts are balanced without interest. That is, a railroad that accepts a shipping fee does not pay interest to the other carriers involved in the shipment, despite the fact that it might hold the fee for up to a month before the railroads balance their interline accounts.

It is undisputed in this case that defendant E & LS owes plaintiffs approximately $1.26 million in past-due interline freight fees—money E & LS collected from shippers and never paid plaintiffs for their participation in interline shipments. E & LS argues that the debt is an unsecured business debt that accrued for services the plaintiffs rendered *to it*. Plaintiffs contend that they are due the money for services they rendered *to the shippers*, and that E & LS holds in trust any fees it collected from shippers on their behalf.

### B.

Missouri Pacific, a Nebraska corporation, and Union Pacific, a Delaware corporation, filed parallel complaints in this diversity action against E & LS, a Michigan corporation, on June 16, 1988. They sought injunctive relief and the imposition of a trust upon E & LS' operating accounts to pay pastdue interline freight fees. Plaintiffs also sought a temporary restraining order and preliminary injunction prohibiting E &

LS from spending or otherwise transferring certain accounts and funds.

On June 21, 1988, the district court granted the plaintiffs' motion for a temporary restraining order. Three days later, on June 24, 1988, the district court determined that plaintiffs had adequate remedies at law and vacated its order of injunctive relief.

On July 12, 1988, E & LS answered the complaints, admitting that it owed plaintiffs interline freight revenue but questioning the actual dollar amounts due. It requested that the district court calculate its debt to plaintiffs, but that it deny plaintiffs' request to impose a trust upon its operating accounts. E & LS insisted that its debts arose from its failure to pay bills, not from conduct so heinous as to justify the imposition of a trust.

On October 5, 1988, plaintiffs moved for summary judgment, arguing that our decision in *Ann Arbor R.R.*, 623 F.2d at 480, *supra*, controlled the case in their favor. E & LS opposed the motion. On December 15, 1988, the district court issued an opinion and order in which it granted plaintiffs' motions for summary judgment, but reserved decision on the issue of the dollar amounts of liability. 702 F.Supp. 630.

On January 12, 1989, E & LS filed a notice of appeal with this court. The parties subsequently stipulated to a dismissal of the appeal because of the nature of the district court's December 15 order. The parties then stipulated to the dollar amount of debt involved, and on May 24, 1989, the district court entered final judgment in the case. E & LS then filed a timely notice of appeal.

The principal issues in this appeal are (1) whether the district court erred in concluding that E & LS held the interline freight fees in trust for plaintiffs, and (2) whether the district court erred in concluding that even in the absence of any controlling federal law, E & LS held the interline freight fees in a constructive trust under Michigan law.

## II.

We review a district court's grant of summary judgment de novo, *Pinney Dock & Transport Co. v. Penn Cent. Corp.*, 838 F.2d 1445 (6th Cir.), *cert. denied*, — U.S. ——, 109 S.Ct. 196, 102 L.Ed.2d 166 (1988), especially where, as here, the judgment was based upon the district court's conclusions of law. *See Loudermill v. Cleveland Bd. of Educ.*, 844 F.2d 304, 308 (6th Cir.), *cert. denied*, — U.S. ——, 109 S.Ct. 363, 102 L.Ed.2d 353 (1988).

## A.

Defendant E & LS recognizes that to prevail in this appeal, it must distinguish the present case from *Ann Arbor* and *In re Penn Central Trans. Co.*, 486 F.2d 519 (3d Cir.1973) (en banc), *cert. denied*, 415 U.S. 990, 94 S.Ct. 1588, 39 L.Ed.2d 886 (1974). In *Penn Central*, the majority applied common law trust principles to the interline network and held that interline freight revenue, when collected, is held in trust for the other carriers participating in the shipment. Judge Adams concurred in the opinion, but argued that the court should not "merely invoke the hoary principles of trust law," but, instead, follow "Congress' interest in creating and maintaining a viable interline rail system." *Id.* at 533. Judge Adams concluded that as a matter of federal law, the national interest in maintaining a sound interline system necessarily granted interline carriers a superior status; *viz.*, over that of other creditors of a collecting carrier.

In *Ann Arbor*, we were persuaded by both the majority's position in *Penn Central*, and Judge Adams' emphasis on the federal interest in the interline system. 623 F.2d at 482. We held that interline freight revenues were "jointly earned revenues pursuant to a monthly settlement," and there was

no logic in the contention that one bankrupt railroad may retain funds *belonging to another interline railroad*, whether or not in bankruptcy, which the collecting carrier was required to pay under the established practice and procedure required by the Interstate Commerce Com-

mission, the Regional Rail Reorganization Act and the rules of the Association of American Railroads.

*Id.* (emphasis added).

The district court below found that the facts and circumstances "pertinent to the rulings in *Ann Arbor Railroad* and *Penn Central,*" were "not materially distinguishable" from this case. The district court concluded that it was compelled by precedent to grant the plaintiffs' motions for summary judgment.

### B.

E & LS argues that *Ann Arbor* is limited to Class I railroads. Yet instead of pointing to any size-based distinctions to support its size-based conclusion, E & LS merely recycles several arguments that prevailed in *Union Pac. R.R. v. Moritz (In re Iowa R.R. Co.)*, 840 F.2d 535 (7th Cir.), *cert. denied*, —— U.S. ——, 109 S.Ct. 244, 102 L.Ed.2d 233 (1988). We are not persuaded by this approach as neither *Ann Arbor* nor *Iowa Railroad* hinged upon ICC size classifications.

*Ann Arbor* and *Penn Central* focused on the nature of the relationship between the railroads in the interline network. *See Ann Arbor*, 623 F.2d at 482; *Penn Central*, 486 F.2d at 524. We and the Third Circuit were persuaded that a trustee-beneficiary relationship was implied where railroads collected fees for each other and balanced their accounts on a monthly basis, without interest. It was also significant in those decisions that the interline network was established to serve the nation's need for a single, unified rail freight system and designed for the convenience of shippers and the financial security of the railroads. Neither decision attached any importance to the various railroads' ICC size classifications or whether the railroads paid their bills with sight drafts or bills and vouchers.

In *Iowa R.R.*, the Seventh Circuit was faced with the question of whether interline revenues are trust funds. 840 F.2d at 535–36. The case involved a Class III rail-

road that owed approximately $4 million in past-due interline freight revenues, including $1.4 million to the Class I Union Pacific, a plaintiff in this case. The court held that interline freight revenues owed to other railroads were merely unsecured business debts. *Id.* at 545.

In its analysis, the Seventh Circuit expressly rejected both the *Penn Central* trust rationale and Judge Adams' concurring position that the federal interest in the interline network preempted state law. *Id.* at 542–45. The only time the court mentioned ICC size classifications was in the portion of its analysis that concluded there were no federal statutes or regulations that supported the "trust fund" decisions of *Penn Central* and *Ann Arbor*. *Id.* at 539. *Iowa R.R.* is a complete rejection of *Penn Central* and the foundations of *Ann Arbor*, and E & LS's attempt to distinguish and reconcile the decisions on the basis of ICC size classifications is meritless.[1] In addition, where *Iowa R.R.* conflicts with *Ann Arbor*, we are bound to follow our precedent. *See In re City of Detroit*, 828 F.2d 1160, 1167 (6th Cir.1987); *Meeks v. Illinois Cent. Gulf R.R.*, 738 F.2d 748, 751 (6th Cir.1984).

E & LS also attempts to distinguish this case based upon its nonmembership in the American Association of Railroads. There are two distinct sets of AAR rules that are relevant to this case, and E & LS fails to appreciate the difference. One set of AAR rules requires all Class I railroads to use sight drafts in settling interline balances; Class II and III members, like nonmembers, are free to use bills and vouchers. As in the case of ICC size classifications and accounting rules, these AAR method-of-payment rules are immaterial to the issue of the nature of the relationship between the railroads in the interline network.

The second type of AAR rules, which E & LS ignores in its arguments, are those that establish and govern the monthly distribution of waybill abstracts and balancing of accounts. It was these rules that helped

---

1. For these same reasons, E & LS's attempt to distinguish its case based upon ICC accounting procedures for Class I railroads is without merit.

persuade us, *Ann Arbor*, 623 F.2d at 482–83, and the Third Circuit, *Penn Central*, 486 F.2d at 525, that the railroads in the interline network maintain a trust relationship. It is undisputed in this case that E & LS participated in the monthly billing and balancing—at least until it stopped paying its bills.

E & LS also stresses the silence in both the old Interstate Commerce Act and the amendments and additions to it in the Staggers Rail Act of 1980, 49 U.S.C. §§ 10101–11917, regarding interline freight revenue. E & LS insists that Congress has never been reticent in its regulation of the railroad industry, and, therefore, its failure to address the matter of interline revenue "clearly demonstrates" its desire that the states be left to regulate it.

In its "congressional silence" argument, E & LS essentially argues that the silence in the Staggers Rail Act directs us to overrule *Ann Arbor* because it echoes the silence in the old Interstate Commerce Act. Yet both *Penn Central* and *Ann Arbor* were decided in the face of the silence of the old Interstate Commerce Act on the exact same subject.

We reject E & LS's attempt to impute size-based distinctions to the *Ann Arbor*, *Penn Central* and *Iowa Railroad* decisions. We also reject E & LS's attempt to dismiss the federal interest in the nation's interline network based upon the amount of an individual railroad's annual operating revenues. Given that there are many more Class III railroads than Class I, the federal interest in a *national* network extends to every branch of the network, and not just the larger limbs. Moreover, adopting E & LS's position would have the ironic effect of trampling upon the federal interest in a smoothly operating nationwide interline freight system by forcing railroads and shippers to collect bills differently and to adopt different accounting and billing systems based upon the different sizes of the many railroads involved in every interline shipment. This federal interest was a primary justification for this court's decision in *Ann Arbor*.

## III.

By holding that *Ann Arbor* applies to all railroads involved in the interline network, we need not reach any of the other issues that were passed upon by the district court. Accordingly, for the foregoing reasons, the judgment of the district court is AFFIRMED.