**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

In re: CONSOLIDATED FREIGHTWAYS
CORPORATION,

*Debtor,*

NORFOLK SOUTHERN RAILWAY
COMPANY,

*Appellant,*

v.

CONSOLIDATED FREIGHTWAYS
CORPORATION; CONSOLIDATED
FREIGHTWAYS CORPORATION OF
DELAWARE,

*Appellees.*

No. 04-55717

D.C. No.
CV-03-00962-JFW

OPINION

Appeal from the United States District Court
for the Central District of California
John F. Walter, District Judge, Presiding

Argued and Submitted
December 7, 2005—Pasadena, California

Filed April 10, 2006

Before: Harry Pregerson, John T. Noonan, and
Sidney R. Thomas, Circuit Judges.

Opinion by Judge Thomas

**COUNSEL**

Paul D. Keenan and Jonathan F. Ball, Janssen Keenan & Ciardi P.C., Philadelphia, Pennsylvania, for the plaintiff-appellant.

Robert A. Klyman and Kimberly A. Posin, Latham & Watkins LLP, Los Angeles, California, for the defendants-appellees.

---

**OPINION**

THOMAS, Circuit Judge:

In this appeal we consider whether, as a matter of federal common law, to recognize the interline trust doctrine and apply it in a federal bankruptcy proceeding. We decline to recognize the doctrine, and affirm the judgment of the district court.

I

Before filing a voluntary petition in bankruptcy in 2002, Consolidated Freightways Corporation ("Consolidated Freightways"), an interstate motor carrier, as defined under the Interstate Transportation Act, 49 U.S.C.A. § 13902, operated one of the largest "less than truckload" long haul freight transportation companies in North America. Norfolk Southern Railway Company ("Norfolk") is a Class I interline freight railroad,[1] the product of hundreds of railroad company mergers over the past century. In providing freight transportation services, Consolidated Freightways commonly engaged in a custom known as "interlining" with other transportation providers, including Norfolk. Interlining is a common practice in the freight transportation industry in which a shipment of freight is moved pursuant to a single bill of lading although more than one company actually transports the goods. Under such an arrangement, either the first or last carrier collects

---

[1]Class I railroads are the largest railroads, classified by revenue, as defined by the Surface Transportation Board. *See* 49 C.F.R. § 1201.1- 1(a) (2005).

payment from the shipper and forwards the appropriate payment to each of the carriers involved.

Norfolk has not been paid for rail transportation of freight pursuant to bills of lading issued by Consolidated Freightways between October 10, 2001, and October 31, 2002. The portion of freight charges received by Consolidated Freightways for rail services provided by Norfolk between those dates is $1,457,954.02. After Consolidated Freightways filed its bankruptcy petition, Norfolk filed a complaint in the bankruptcy court, claiming that Consolidated Freightways held the money in trust for Norfolk under the "interline trust doctrine." Norfolk further asserted that because Consolidated Freightways was holding the money in trust for Norfolk, the money was not part of the bankruptcy estate for purposes of bankruptcy proceedings and should therefore be paid to Norfolk immediately.

Consolidated Freightways filed a motion to dismiss Norfolk's complaint pursuant to Bankruptcy Rule 7012(b) and Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. Consolidated Freightways asserted that the interline trust doctrine does not exist and that therefore Norfolk's complaint failed to assert a legally cognizable cause of action.

The bankruptcy court granted the motion to dismiss. Norfolk timely appealed that decision to the district court. The district court entered a minute order affirming the bankruptcy court's grant of Consolidated Freightways's motion to dismiss. This timely appeal followed. We review a dismissal for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) de novo. *See Decker v. Advantage Fund, Ltd.*, 362 F.3d 593, 595-96 (9th Cir. 2004).

## II

We decline to adopt the interline trust doctrine as a matter of federal common law. While federal common law is most

commonly applied in cases where the United States is a party or the interests of the federal government are directly at interest, there are situations where the application of federal common law is appropriate in cases between private parties. *See Miree v. DeKalb County*, 433 U.S. 25, 29 (1977) ("[F]ederal common law may govern even in diversity cases where a uniform national rule is necessary to further the interests of the Federal Government.").

[1] However, the Supreme Court has instructed that the creation of federal common law is disfavored except where explicitly authorized by Congress. In *O'Melveny & Myers v. FDIC*, 512 U.S. 79 (1994), the Court noted that the "cases in which judicial creation of a special federal rule would be justified . . . are few and restricted, limited to situations where there is a significant conflict between some federal policy or interest and the use of state law." *Id.* at 87.

[2] In determining whether such a conflict exists, the Court has looked to three factors, the need for uniformity of law across the nation, "whether application of state law would frustrate specific objectives of the federal programs," and "the extent to which application of a federal rule would disrupt commercial relationships predicated on state law." *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 728-29 (1979).

[3] There are two federal interests involved: federal bankruptcy law and the laws pertaining to interstate transportation. Application of federal bankruptcy law does not justify the creation of a new federal common law rule. Rather, under *Butner v. United States*, 440 U.S. 48 (1979), "[p]roperty interests are created and defined by state law" and "[u]nless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding." *Id.* at 55. Nothing in the Bankruptcy Code creates a special status for interline balances, although the issue was discussed specifically by Congress during consideration of the legislation

that eventually formed the 1978 Bankruptcy Code. *See Union Pac. R.R. Co. v. Moritz (In re Iowa Railroad Co.)*, 840 F.2d 535, 538 (7th Cir. 1988). Indeed, a provision mandating payment of interline balances passed the Senate; however, "[t]he Code as enacted does not so much as mention interline balances." *Id.* No other interstate industry enjoys special protection in federal bankruptcy proceedings. Thus, one cannot say that the underlying principles of federal bankruptcy law auger for the recognition of a federal common law rule.

**[4]** Thus, the question becomes whether federal regulation of interstate transportation requires the creation of a new federal common law rule. "That the dispute involves the interstate transportation network is not enough." *Id.* at 540 (citing *Miree v. DeKalb Co.*, 433 U.S. 25 (1977)). Nor does the fact that the interstate transportation is heavily regulated control; because "[e]xtensive regulation is no substitute for a conflict." *Id.* Indeed, the most recent comprehensive Congressional action concerning interstate transportation, the enactment of the Interstate Transportation Act ("Transportation Act") in 1996, 49 U.S.C. §§ 10101-16106, reduced the federal regulatory role.[2] The Transportation Act added as a policy objective the need to "to minimize the need for Federal regulatory control over the rail transportation system," 49 U.S.C. § 10101, a provision that did not exist under the Interstate Commerce Act in the late 1970s. *See* Interstate Commerce Act, Pub. L. No. 95-473, 92 Stat. 1337 (1978) (codified at 49 U.S.C. §§ 10101-11915). The Transportation Act itself contemplates a system of private, not federally created, relationships. For example, the Transportation Act provides that rail carriers

---

[2]The Interstate Commerce Commission Termination Act of 1995, Pub. L. No. 104-88, 109 Stat. 803 (Dec. 29, 1995), substituted the Transportation Act for the Interstate Commerce Act, both located at Subtitle IV of Title 49 of the United States Code. The majority of the provisions of the Interstate Commerce Act were reenacted in the Transportation Act. Although Norfolk refers to the Interstate Commerce Act in its briefing, the debt at issue in this case was incurred after the enactment of the Transportation Act. Therefore we base our decision on the Transportation Act.

shall establish through routes (including physical connections) with each other and with water carriers . . . [,] shall establish rates and classifications applicable to those routes, and shall establish rules for their operation and provide—

> (1) reasonable facilities for operating the through route; and

> (2) reasonable compensation to persons entitled to compensation for services related to the through route.

49 U.S.C. § 10703. The Transportation Act does not create a federally-guaranteed system of payment of interline balances. In short, the current statutory interstate transportation scheme does not provide significant support for the notion that there is a strong federal policy that warrants the creation of federal common law recognizing a trust relationship among shippers.

Norfolk points to three statutory provisions to demonstrate that there is a general federal policy to "foster sound economic conditions in transportation and to ensure effective . . . coordination between rail carriers and other modes[.]" 49 U.S.C. § 10101(5); *see also* 49 U.S.C. § 13101(a)(2)(K) (It is the policy of the United States in its regulation of motor carriers to "promote competitive and efficient transportation services in order to . . . promote intermodal transportation."). In addition to these general policy statements, Norfolk highlights § 10705, entitled "Authority: through routes, joint classifications, rates, and divisions prescribed by Board." 49 U.S.C. § 10705. That section states:

> (a)(1) The [Surface Transportation] Board may, and shall when it considers it desirable in the public interest, prescribe through routes, joint classifications, joint rates, the division of joint rates, and the conditions under which those routes must be operated, for a rail carrier providing transportation subject to the jurisdiction of the Board under this part. . . .

(b) The Board shall prescribe the division of joint rates to be received by a rail carrier providing transportation subject to its jurisdiction under this part when it decides that a division of joint rates established by the participating carriers under section 10703 of this title, or under a decision of the Board under subsection (a) of this section, does or will violate section 10701 of this title.

*Id.*

Norfolk argues that the general policy supporting effective and efficient intermodal transportation, together with the use of the phrase "to be received" in describing "the division of joint rates" in 49 U.S.C. § 10705, demonstrates that the United States' policy is "that a carrier participating in an interline movement not only be entitled to a division of the freight charge, but that the carrier actually receive its earned division." However, this argument is unconvincing. While the general argument that the use of the term "to be received" implies the need for a trust relationship is itself questionable, the section where the words appear only apply in circumstances where the Board determines that the existing division of joint rates "does or will violate section 10701." 49 U.S.C. § 10705. In such a situation it makes sense that the Board is determining how much the carrier will actually receive, because it has already held that the existing division violates public policy. The implementing authority for this section does not mention the relationship between interline carriers. Rather, it focuses on the procedure for requesting the prescription of a through route or rate before the Surface Transportation Board and the procedure for the Board to prescribe a through route or rate on its own. *See* 49 C.F.R. §§ 1144.1-1144.3.

Further, Norfolk's argument that federal common law is justified based on the general policy underlying the Transportation Act is further undermined by the concurrent policy of the regulation "to allow, to the maximum extent possible, competition and the demand for services to establish reason-

able rates for transportation by rail" and "to minimize the need for Federal regulatory control over the rail transportation system." 49 U.S.C. § 10101(1), (2). These two policy goals are more supportive of a system in which rail carriers are free to contract with other transportation providers in providing through service rather than strictly determining that all interline accounts are held in trust for other carriers.

Moreover, unlike other statutes, the Transportation Act does not contain any provisions encouraging the development of federal common law by the courts.[3]

[5] In sum, the policies underlying federal bankruptcy and interstate transportation law do not conflict significantly with the use of state law in determining the payment of interline balances. Therefore, the creation of a new federal common law rule imposing a constructive trust for the payment of interline balances in bankruptcy is not justified.[4]

**AFFIRMED**.

---

[3]For example, and in contrast, under ERISA, Congress has authorized the courts "to formulate a nationally uniform federal common law to supplement the explicit provisions and general policies set out in [the Act]." *Peterson v. Am. Life & Health Ins. Co.*, 48 F.3d 404, 411 (9th Cir. 1995) (internal quotation omitted).

[4]Although the Seventh Circuit has reached a similar conclusion, *Union Pac. R.R. Co.*, 840 F.2d at 545, we recognize that the Third and the Sixth Circuits have held that the interline trust doctrine exists as a matter of federal common law. *See Parker Motor Freight, Inc. v. Fifth Third Bank*, 116 F.3d 1137 (6th Cir. 1997); *Ann Arbor R.R. Co. v. Comm. of Interline R.R. (In re: Ann Arbor R.R. Co.)*, 623 F.2d 480 (6th Cir. 1980); *In re: Penn Central Trans. Co.*, 486 F.2d 519 (3d Cir. 1973). *In re: Ann Arbor Railroad* and *In re: Penn Central Transportation* were decided on the basis of pre-Bankruptcy Code and pre-Transportation Act law. To the extent that the cases apply the doctrine under the Bankruptcy Code and Transportation Act, we disagree and join the Seventh Circuit in rejecting the application of the interline trust doctrine in bankruptcy.